UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FIR TREE CAPITAL OPPORTUNITY MASTER FUND, LP and FIR TREE VALUE MASTER FUND, LP,<br><br>Plaintiffs,<br><br>– against –<br><br>ANGLO IRISH BANK CORPORATION LIMITED (f/k/a ANGLO IRISH BANK CORPORATION PLC),<br><br>Defendant. | Case No. 11 Civ. 0955 (PGG)<br><br>**DECLARATION OF JAMES A. BRADLEY IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, James A. Bradley, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am the Head of Financial Markets for Anglo Irish Bank Corporation Limited, f/k/a Anglo Irish Bank Corporation PLC ("Anglo Irish"), the Defendant in this action. I make this Declaration for and on behalf of the Defendant in this action, in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction. I further make this Declaration based on and to the best of my personal knowledge and to bring to the attention of the Court certain publicly available documents and information.

**Introduction**

2. As I detail in the facts set forth below, since Ireland fell victim to the worldwide credit crisis, the Irish Government, with support from the European Union ("EU") and International Monetary Fund ("IMF"), has taken numerous steps to stabilize and preserve Ireland's economy and banking system and to prevent an overall collapse of the Irish economy. Since the nationalization of Anglo Irish in January 2009, the Irish Government has injected tens



of billions of euros of capital support into Anglo Irish and has passed legislation directly targeted at stabilizing Ireland's credit institutions, including Anglo Irish.

3. As I understand Plaintiffs' allegations, they assert that an Order made by the High Court of Ireland -- at the request of Ireland's Minister for Finance and pursuant to Irish law, which was enacted as an emergency response to stabilize Ireland's credit institutions -- will render Anglo Irish insolvent and therefore unable to make future interest and principal payments on subordinated notes Plaintiffs purchased in November 2010 that were originally issued by Anglo Irish in 2005 (the "Notes"). This is simply not true -- as I explain further below, the actions by Ireland's Minister for Finance will in effect achieve the exact opposite result. In addition, the Order by the High Court of Ireland only directs Anglo Irish to formulate a plan for a possible future acquisition or merger in connection with the latest in a series of restructuring plans which has been submitted to the European Commission for approval, which plan may or may not be accepted by the European Commission. Three previous plans have been proposed since May 2009, none of which has been approved. Thus, there is no imminent threat of a merger of or acquisition by Anglo Irish. Even if an acquisition or merger eventually takes place, the current expectation is for Anglo Irish to be the surviving entity. Actions taken by the Government since the nationalization have significantly buttressed the balance sheet of Anglo Irish. I expect that future actions will similarly guard against insolvency and that Anglo Irish will be able to satisfy any potential judgment by Plaintiffs. Finally, to date, Anglo Irish has made all payments due under the Notes, including payments to Plaintiffs. I know of no basis for speculation that this will change going forward.



4.      In addition, the actions of Anglo Irish criticized by Plaintiffs are in large parts acts of the Government of the Republic of Ireland intended to promote the stability of Anglo Irish, the Irish banking system and the overall economy of Ireland.

**An Overview Of Ireland's Economic Crisis And The Irish Government's Guarantee Of Anglo Irish's Debt**

5.      In September 2008, Ireland became the first eurozone economy officially to fall into recession in the wake of the global financial crisis.[1] After Irish banks suffered significant collapses in their share prices and difficulties in obtaining funding, on September 30, 2008, the Government of Ireland announced that it had decided to put in place effective immediately a guarantee arrangement to safeguard all deposits and most debt securities issued by a number of Irish banks, including Anglo Irish.[2] The guarantee covered all existing relevant debts of these institutions and any new relevant debts incurred or issued from September 30, 2008 to September 29, 2010.[3] The Irish Government stated that it had put the guarantee in place following advice from the Governor of the Central Bank of Ireland about the impact of the then-recent international market turmoil on the Irish banking system.[4] On October 17, 2008, Ireland's Minister for Finance published the Credit Institutions (Financial Support) Scheme 2008 ("Credit Institutions Scheme") under the provisions of the Credit Institutions (Financial Support) Act 2008 to give effect to the guarantee.[5]

---

[1] A true and correct copy of the *Financial Times* article, "Ireland first in eurozone to hit recession," dated September 25, 2008 is attached hereto as Exhibit 1.

[2] A true and correct copy of a press release by the Minister for Finance of Ireland dated September 30, 2008 is attached hereto as Exhibit 2.

[3] *See* Exhibit 2.

[4] *See* Exhibit 2.

[5] A true and correct copy of the Credit Institutions (Financial Support) Scheme 2008 is attached hereto as Exhibit 3.

6. In the first half of 2009, Ireland was faced with rising unemployment rates and falling GDP and commercial and residential property prices.[6] In June 2009, the IMF annual staff report described Ireland's short-term outlook as "bleak" and predicted that the economy would shrink by 8.5% in 2009 and another 3% in 2010, and that the unemployment rate would hit 15.5% in 2010.[7] The report stated that: "The Irish economy is in the midst of an unprecedented economic correction. The stress exceeds that being faced currently by any other advanced economy and matches episodes of the most severe economic distress in post-World War II history."[8] As a result of the economic stresses experienced in Ireland and the unemployment rate, residential property prices in Ireland fell by more than 38% from their peak in late 2006.[9] In December 2009, the Irish Government established the National Asset Management Agency to acquire land and development loans (secured on development land and property under development) from Irish banks in return for government guaranteed bonds.[10]

7. By September 30, 2010, the projected cost of bailing out Ireland's stricken banks had risen to €40 billion (US $54.6 billion), which meant the Irish Government would run a budget deficit equivalent to 12% of the GDP for 2009, increasing to 32% of GDP in 2010.[11] On December 9, 2009, the Irish Government presented the 2010 budget which proposed to deliver

---

[6] A true and correct copy of the Irish Department of Finance's "Pre-Budget Outlook," Office of Government Publications, Dublin, dated November 2009 is attached hereto as Exhibit 4.

[7] A true and correct copy of the IMF's "Ireland: 2009 Article IV Consultation—Staff Report", dated June 2009 is attached hereto as Exhibit 5.

[8] See Exhibit 5.

[9] A true and correct copy of the "Permanent TSB/ESRI House Price Index – Quarter 4 2010 Figures", Economic and Social Research Instituted, Dublin, dated January 2011 is attached hereto as Exhibit 6.

[10] A true and correct copy of the National Asset Management Agency Act 2009 is attached hereto as Exhibit 7; a true and correct copy of the European Commission Communiqué No. (2010)1155, Brussels, dated February 26, 2010 is attached hereto as Exhibit 8.

[11] A true and correct copy of the Economic and Social Research Institute's Quarterly Economic Update dated Autumn 2010 is attached hereto as Exhibit 9; a true and correct copy of a Department of Finance press release titled, "Information Note on Ireland's Reported 2009 General Government Deficit," dated April 22, 2010 is attached hereto as Exhibit 10.

savings of more than €4 billion (US $5.4 billion), slashing public pay and welfare in a bid to halt the soaring budget deficit.[12]

8. On November 21, 2010, Ireland's Prime Minister announced that the Government had applied for tens of billions of euros in aid from the EU and the IMF.[13] On November 28, 2010, the EU and IMF approved a €85 billion (US $115.4 billion) rescue package for Ireland.[14]

**The Republic Of Ireland Nationalizes Anglo Irish**

9. On January 21, 2009, the Anglo Irish Bank Corporation Act 2009 (the "Anglo Irish Bank Act") was enacted in connection with the nationalization of Anglo Irish Bank Corporation Public Limited Company.[15] Under the Anglo Irish Bank Act, all of the shares in Anglo Irish were transferred to Ireland's Minister for Finance, following the delisting of its shares from the Irish and London Stock Exchanges. Anglo Irish then became a private, unlisted company, Anglo Irish Bank Corporation Limited.[16]

**The Republic Of Ireland Spends Tens Of Billions Of Euros And Enacts Legislation To Stabilize Anglo Irish And The Irish Banking System**

10. Between June and September 2009, recognizing the systemic importance of Anglo Irish to the entire Irish financial system, the Irish Government injected €4 billion (US $5.4

---

[12] A true and correct copy of the Financial Statement of the Minister for Finance, Mr. Brian Lenihan, T.D., dated, December 9, 2009 is attached hereto as Exhibit 11.

[13] A true and correct copy of the *Financial Times* article, "Europe signs up to Irish rescue," dated November 21, 2010 is attached hereto as Exhibit 12.

[14] A true and correct copy of the *Financial Times* article, "Ministers sign off on €85bn Ireland deal," dated November 29, 2010 is attached hereto as Exhibit 13.

[15] A true and correct copy of the Anglo Irish Bank Corporation Act 2009 is attached hereto as Exhibit 14.

[16] *See* Exhibit 14.



billion) in equity into Anglo Irish by way of a subscription for ordinary shares.[17] The Irish Government stated that it was recapitalizing Anglo Irish for the following reasons:

- To protect the Irish Sovereign and economy from the negative impact that would be triggered by Anglo Irish's failure (e.g., potential significant increases in Sovereign and corporate borrowing costs);

- To prevent Anglo Irish from becoming a systemic threat to the stability of the Irish banking system; and

- To protect customer and interbank deposits, many of which originated outside of Ireland (in the United Kingdom, Isle of Man, the eurozone and the United States).[18]

11.  Throughout 2010, the Irish Government continued to inject significant additional amounts of further capital -- approximately €25.3 billion (US $34.3 billion) -- into Anglo Irish via promissory notes issued by Ireland's Minister for Finance.[19]

12.  While the Irish Government was providing the aforementioned capital injections to Anglo Irish, in December 2009, it developed another asset relief measure for credit institutions in Ireland -- the National Asset Management Agency Act 2009 (the "NAMA Act").[20] The NAMA Act enables participating Irish financial institutions to sell qualifying illiquid loans to the National Asset Management Agency ("NAMA") and, in exchange, receive liquid, Government-

---

[17] A true and correct copy of a Department of Finance press release titled, "Publication of Anglo Irish Bank Accounts for the Six Months to 31st March 2009 – Statement of the Minister for Finance, Brian Lenihan TD," dated March 29, 2009 is attached hereto as Exhibit 15.

[18] *See* Exhibit 15.

[19] A true and correct copy of the Affidavit of Ann Nolan in Support of Application by the Minister for Finance for a Direction Order in Relation to Anglo Irish Bank Corporation Limited ("Affidavit in Support of Minister for Finance Application") dated February 7, 2011 is attached hereto as Exhibit 16. *See* Exhibit 16 at ¶¶ 43, 45.

[20] A true and correct copy of the National Asset Management Agency Act 2009 is attached hereto as Exhibit 7; a true and correct copy of the European Commission Communiqué No. (2010)1155, Brussels, dated February 26, 2010 is attached hereto as Exhibit 8.



guaranteed securities. These securities are used by banks, including Anglo Irish, as collateral to access short-term funding.[21]

13. As made clear in the NAMA Act, the overall objective of this initiative was to "address the serious threat to the economy and the stability of credit institutions in the State generally" and bring stability to the banking system by removing impaired loans from the balance sheets of individual banks and providing urgently-needed liquidity to Ireland's banking system.[22] The NAMA Act was enacted "to resolve the problems created by the financial crisis in an expeditious and efficient manner and achieve a recovery in the economy."[23]

14. Commentators have likened the NAMA scheme to the Troubled Asset Relief Program implemented in the United States in 2008 pursuant to the *Emergency Economic Stabilization Act* of 2008.[24]

15. Under the NAMA Act, the long-term economic value of a bank asset is determined based upon a prescribed valuation methodology.[25] In 2010, Anglo Irish transferred billions of euros of loan assets to NAMA.

16. The loan transfers Anglo Irish made under NAMA or other prior sales were not part of any effort to dispose of or dissipate assets. Rather, such transfers were done in an orderly fashion as part of a public program and had the effect of assisting in relieving funding stresses, increasing liquidity and maximizing recovery on the remaining non-NAMA loan exposures for Anglo Irish, its creditors, and its shareholder, the Republic of Ireland.

---

[21] A true and correct copy of "The National Asset Management Agency: A Brief Guide," National Asset Management Agency, Dublin, dated March 30, 2010 is attached hereto as Exhibit 17.

[22] *See* Exhibit 7.

[23] *See* Exhibit 7.

[24] A true and correct copy of the *Sunday Tribune* article, "In NAMA, the Irish government is playing a risky strategy with taxpayers' money," dated September 27, 2009 is attached hereto as Exhibit 18.

[25] *See* Exhibit 7, Part 5.



**Plaintiffs Bought Subordinated Debt Issued By Anglo Irish After Anglo Irish Undertook A Public Liability Management Exercise**

17.  In 2005, Anglo Irish issued the Notes -- $165,000,000 Subordinated Notes, Series A, due September 29, 2015 and $35,000,000 Subordinated Notes, Series B, due September 29, 2017 -- pursuant to a U.S. Private Placement (the "Note Purchase Agreement").[26]

18.  According to their terms, all amounts payable under the Notes are subordinated to claims of senior creditors of Anglo Irish. The Notes are subordinated in order to qualify as regulatory capital in order to absorb losses in the event of Anglo Irish being wound-up or dissolved. The Notes are not on a par with and rank below Anglo Irish's senior liabilities, which represent the vast majority of Anglo Irish's liabilities. Accordingly, if there was a winding-up of Anglo Irish, the Note holders would be entitled to payment only to the extent that all senior creditors have been paid in full. It is only as a result of the significant capital contributions by the Government of Ireland that the Note holders now have the prospect of receiving payment on the Notes. Absent such capital injections there was little likelihood of the Notes being repaid at all.

19.  On September 29, 2010, prior to Plaintiffs' purchase of the Notes, the Credit Institutions Scheme, through which the Irish Government had guaranteed certain debt issued by Irish credit institutions for the past two years, including the Notes, expired.[27]

20.  On September 30, 2010, also prior to Plaintiffs' purchase of the Notes, Ireland's Minister for Finance published a "Statement on Banking" in which the Irish Government stated that, with respect to the substantial losses suffered by Anglo Irish, "the holders of Anglo's

---

[26] A true and correct copy of the Note Purchase Agreement is attached hereto as Exhibit 19.

[27] A true and correct copy of a National Treasury Management Agency publication titled, "Credit Institutions (Eligible Liabilities Guarantee) Scheme 2009 – Frequently Asked Questions," dated November 19, 2010 is attached hereto as Exhibit 20.



subordinated debt should share the costs which have arisen."[28] The "Minister's Statement on Banking" elaborated on the Irish Government's future plans in this respect:

> ". . . [M]y Department in conjunction with the Attorney General is working on resolution and reorganisation legislation, which will enable the implementation of reorganisation measures specific to Anglo Irish Bank and [Irish Nationwide Building Society] which will address the issue of burden-sharing by subordinated bondholders . . . . I expect the subordinated debt holders to make a significant contribution towards meeting the costs of Anglo."[29]

21.   On October 21, 2010, Anglo Irish announced a "Liability Management Exercise" ("LME") whereby certain of Anglo Irish's subordinated debt securities holders, including the Note holders, were invited to participate in a voluntary offer to exchange their subordinated debt for senior debt securities unconditionally guaranteed by the Irish Government, at an exchange price of $0.20 per $1 face value.[30] The Exchange Offer Memorandum that was issued in connection with the LME with respect to the Notes made express reference to Ireland's Minister for Finance's September 30, 2010 Statement on Banking.[31]

22.   Similar exchange offers were made to the holders of other dated subordinated debt securities issued by Anglo Irish or its subsidiaries. In total, in excess of 92% of the relevant other holders of dated subordinated debt issued by Anglo Irish and ranking at the same level as the Notes which were subject to the LME elected to participate and exchange their dated subordinated debt securities for senior debt securities guaranteed by the Government of Ireland. The overall effect of the LME was to reduce the subordinated liabilities and increase the core capital levels of Anglo Irish.

---

[28] A true and correct copy of the "Minister's Statement on Banking," dated September 30, 2010 is attached hereto as Exhibit 21.

[29] *See* Exhibit 21.

[30] A true and correct copy of the Exchange Offer Memorandum issued by Anglo Irish Bank Corporation Limited, dated, October 21, 2010 is attached hereto as Exhibit 22.

[31] *See* Exhibit 22.

23.     Although all of the former Note holders were invited to participate in the October 21, 2010 exchange offer, none of them tendered their securities in exchange for the senior debt securities issued by Anglo Irish and guaranteed by the Republic of Ireland. Instead, I understand that, in November 2010, the Plaintiffs purchased all of the outstanding Notes under the U.S. Private Placement from the existing holders for some fraction of the principal amount, believed to be in the range of $0.22 to $0.25. Plaintiffs elected not to participate in the LME. As no Notes under the U.S. Private Placement were tendered under the LME, the Notes were not exchanged for senior guaranteed debt.

### Ireland Enacts The Credit Institutions (Stabilisation) Act 2010 And Ireland's Minister For Finance Obtains A Direction Order Pursuant To The Act

24.     On December 21, 2010, the Credit Institutions (Stabilisation) Act 2010 ("Credit Stabilisation Act") was enacted into law in Ireland.[32]  The Credit Stabilisation Act states that it was implemented because "measures are necessary to address a unique and unprecedented economic crisis which has led to difficult economic circumstances and severe disruption to the economy."[33] *Id.* Thus, the Credit Stabilisation Act was enacted, among other reasons, for the following purposes:

- "to address the serious and continuing disruption to the economy and the financial system and the continuing serious threat to the stability of certain credit institutions in the State and the financial system generally";

- to provide for "stabilisation, and the preservation or restoration of the financial position of certain credit institutions"; and

- to "continue the process of reorganisation, preservation and restoration of the financial position of Anglo Irish Bank Corporation Limited begun with the Anglo Irish Bank Corporation Act 2009."[34]

---

[32] A true and correct copy of the Credit Stabilisation Act is attached to hereto as Exhibit 23.

[33] *See* Exhibit 23.

[34] *See* Exhibit 23.

*Id.*

25.     Plaintiffs assert that the Credit Stabilisation Act authorizes Ireland's Minister for Finance to obtain orders "that purport to eliminate any and all rights of subordinated creditors such as the Noteholders," and further assert that creditors such as the Note holders shall not have the opportunity to object to the making of such an order.[35]

26.     This assertion is incorrect. Firstly, the Credit Stabilisation Act does not, simply by its existence, expressly modify or eliminate the terms of agreements governed by laws outside of the Republic of Ireland (or in certain circumstances, those of other members of the European Economic Area). Secondly, to the extent that the rights of any subordinated creditor are modified by a "subordinated liabilities order" under the terms of the Credit Stabilisation Act, there are express rights for such a creditor to apply to have such an order set aside, varied or amended on various grounds.[36] Thirdly, no "subordinated liabilities order" has been made.

27.     On February 7, 2011, Ireland's Minister for Finance applied for a Direction Order with respect to Anglo Irish under the Credit Stabilisation Act.[37] On February 8, 2011, a Direction Order was made by the High Court of Ireland under the Credit Stabilisation Act.[38] The Direction Order required Anglo Irish to, among other things:

- "formulate a detailed steps plan for the acquisition of and/or merger with [Irish Nationwide Building Society ("INBS")] and deliver it to the [National Treasury Management Agency ("NTMA")] no later than 31 March 2011"; and

---

[35] *See* Plaintiffs' Complaint at ¶¶ 4, 31.

[36] *See* Exhibit 23.

[37] *See* Exhibit 16.

[38] A true and correct copy of the Direction Order is attached hereto as Exhibit 24.



- take steps "in connection with an auction process . . . to be operated by the [NTMA] in respect of the transfer of certain of [Anglo Irish's] deposits and assets".[39]

28. Pursuant to the terms of European Commission State Aid rules, a condition to any contribution of public funding is that the Government of Ireland must submit a restructuring plan as to the future business of the recipient.[40]

29. The Restructuring Plan submitted to the European Commission on January 31, 2011 is the most recent in a series of submitted restructuring plans for Anglo Irish. In 2009 and 2010, at least three other plans were submitted to the European Commission without being approved.

30. The Direction Order obliges Anglo Irish only to develop and submit a steps plan by March 31, 2011 for how an acquisition of, or merger with INBS, another nationalized Irish financial institution that has also received infusions of capital and other financial support from the Irish Government, could be effected and implemented. The Direction Order does not mandate that any acquisition or merger must occur or initiate any such acquisition or merger. Plaintiffs' claim that the Direction Order "directs Anglo Irish Bank to consolidate" with INBS is not supported by the clear language of the Direction Order.[41]

31. In any event, any acquisition by Anglo Irish of, or merger with, INBS would be contingent upon numerous intermediate measures that must be taken in addition to the "detailed steps plan":

---

[39] See Exhibit 24 at ¶¶ 2.5, 1.

[40] A true and correct copy of the European Commission Communication on the Return to Viability and the Assessment of Restructuring Measures in the Financial Sector in the Current Crisis Under the State Aid Rules dated August 19, 2009 is attached hereto as Exhibit 25.

[41] See Plaintiffs' Motion at 8.

(i) Any Restructuring Plan must be approved by the European Commission under State Aid rules;

(ii) It is likely that INBS will have to be "demutualised" under the Building Societies Act of Ireland and reincorporated as a limited liability company; and

(iii) Anglo Irish may first acquire the shares or net assets in the newly incorporated successor to INBS -- either pursuant to an order made by the High Court of Ireland under the Credit Stabilisation Act, or by way of acquisition of shares in the newly-incorporated INBS successor entity.

32. As of today's date, only a limited amount of preparatory work has been undertaken by Anglo Irish to develop such a steps plan. There is no certainty that the Restructuring Plan, to which such steps plan is linked, will even be approved by the European Commission. None of the three previous plans submitted was approved. Indeed, there is no certainty that Anglo Irish will acquire or merge with another financial institution.

33. As set forth in the Affidavit in Support of Minister for Finance Application, the nationalization of Anglo Irish and the implementation of the Credit Stabilisation Act were measures undertaken by the Irish Government in order "to safeguard the stability of the financial system" in response, in part, to the effect of the global financial crisis, the collapse in Irish property prices and the deterioration of the financial position of credit institutions in Ireland, including Anglo Irish.[42] The Direction Order is simply the most recent step taken by the Irish Government in connection with its efforts to protect Ireland's financial system.

**Anglo Irish Is Solvent And There Is No Evidence That Any Acquisition Or Merger With INBS Will Affect Plaintiffs' Subordinated Notes**

34. Plaintiffs claim that Anglo Irish is on a path of "rendering itself destitute."[43] The Irish Government -- with support from the EU and International Monetary Fund -- has provided billions of euros worth of capital support to Anglo Irish in 2009 and 2010; Anglo Irish

---

[42] *See* Exhibit 16, ¶¶ 8, 21, 36, 46.

[43] *See* Plaintiffs' Motion at 2.

substantially strengthened its financial position and helped to de-risk its balance sheet by availing of NAMA. Anglo Irish engaged in the Liability Management Exercise in order to decrease its outstanding subordinated debt and increase its core capital through a voluntary exchange offer. All of these actions significantly increased the financial strength of Anglo Irish and its prospects of paying its debts.

35. Even if Anglo Irish eventually undertakes and completes all the necessary steps leading to an acquisition of INBS by Anglo Irish, my understanding is that the current expectation is for Anglo Irish to be the surviving entity since, according to the most recent available audited financial statements, Anglo Irish has gross assets of €87 billion (approximately US $118.3 billion), compared to gross assets of INBS of approximately €13.3 billion (US $18.1 billion).[44] In that event, it is my belief that Anglo Irish would also continue to operate as a company incorporated under the laws of Ireland. In such a scenario, Anglo Irish is likely to still continue to receive the financial support from the Government of Ireland including the benefit of various guarantees.

36. Plaintiffs' claim that "the dissipation and depletion of [Anglo Irish's] assets is well under way" is untrue.[45] The fact is that Anglo Irish is a solvent entity and it continues to meet its obligations, including those due under the Notes. If an acquisition should come to pass, Anglo Irish and INBS, both of which have received billions in state aid from the Irish Government, are expected to remain in a position to satisfy any potential judgment of $200,000,000 that may be obtained by Plaintiffs. Thus, the potential for an acquisition by Anglo Irish of INBS does not change the position of the Note holders. It should further be noted that

---

[44] A true and correct copy of Anglo Irish Bank June 30, 2010 audited financial statements is attached hereto as Exhibit 26; a true and correct copy of INBS December 31, 2009 audited financial statements is attached hereto as Exhibit 27.

[45] *See* Plaintiffs' Motion at 8.

Anglo Irish is approximately seven times the size of INBS, based on balance sheet size of the two entities.

37. Contrary to Plaintiffs' assertions, Anglo Irish has not violated Section 9.3 of the Note Purchase Agreement, which concerns "consolidation, merger or disposition of assets." That section of the Note Purchase Agreement provides that Anglo Irish will not consolidate, merge or dispose of substantially all of its assets unless:

> (i) the surviving entity of such consolidation or merger or the transferee of such assets (x) is a solvent Person organized under the laws of any OECD Member State or any jurisdiction therein and (y) if other than [Anglo Irish], (1) expressly assumes in writing all obligations of [Anglo Irish] under this Agreement and the Notes and (2) causes to be delivered to each holder of Notes an opinion of independent counsel reasonably satisfactory to the Holders of at least 51% in aggregate principal amount of the Notes, to the effect that the agreements or instruments effecting such assumption are enforceable in accordance with their terms and comply with the terms hereof . . . ."[46]

38. As stated above, if there were to be a merger or acquisition, which is by no means certain, Anglo Irish is expected to be the surviving entity. Further, my present understanding is that it would remain solvent. There is also no basis for any belief that Anglo Irish would not be able to obtain an opinion of independent counsel reasonably satisfactory to the Note holders of the type contemplated in Section 9.3 of the Note Purchase Agreement.

**Anglo Irish Has Made All Payments To Plaintiffs Under The Notes**

39. As acknowledged in the Declaration submitted by Plaintiffs, all amounts of interest due and payable to the holders of the Notes, including any payments to Plaintiffs, have been paid in full when due.[47] The last interest payment was made on December 29, 2010, with

---

[46] See Exhibit 19, § 9.3.

[47] See Declaration of Brian A. Meyer attached to Plaintiff's Motion at ¶ 10.

the next payment of interest scheduled for March 29, 2011. Principal on the Notes is due and payable in 2015 and 2017. Anglo Irish has never made any statement or representation that it intends to discontinue payments under the Notes. There is no reason to believe that Anglo Irish cannot or will not make the next quarterly payment when due.

40. Plaintiffs claim that they will be "stripped of their right to collect interest and principal payments."[48] This is incorrect. To the contrary, Plaintiffs received their full December 2010 coupon payment on the Notes even after the offer to exchange the Notes expired in November 2010.

41. Anglo Irish has never made any statements or given any other indication that it will not continue to pay the interest on the Notes or the principal when it comes due.

42. Plaintiffs are subordinated debt holders of Anglo Irish. Accordingly, if Anglo Irish were at any point to wind-up or file for bankruptcy, payments of interest and principal under the Notes will only be payable upon all senior unsecured creditors having been paid in full.

---

[48] *See* Plaintiffs' Motion at 9.

**Conclusion**

43.     In summary, there is no imminent action being taken by Anglo Irish that constitutes a violation of the Notes or that will adversely affect Plaintiffs' rights under the Notes. Anglo Irish is continuing to preserve and stabilize its financial position and, since Anglo Irish was nationalized, the Irish Government has taken actions and enacted legislation that has resulted in Anglo Irish having more stability, liquidity support, and reduced liabilities. It is reasonable to conclude that any further actions involving Anglo Irish will be aimed at achieving the same goals.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 22, 2011

_____
James A. Bradley
22 FEBRUARY 2011