UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIR TREE CAPITAL OPPORTUNITY MASTER
FUND, LP and FIR TREE VALUE MASTER
FUND, LP,

                              Plaintiffs,

              v.


ANGLO IRISH BANK CORPORATION
LIMITED (f/k/a ANGLO IRISH BANK
CORPORATION PLC),

                              Defendant.

**ECF CASE**


**MEMORANDUM OPINION &
ORDER**


11 Civ. 0955 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

              Plaintiffs Fir Tree Capital Opportunity Master Fund, LP and Fir Tree Value

Master Fund, LP hold $200 million in notes issued by Defendant Anglo Irish Bank Corporation

Limited (the "Bank").  As a result of the 2008 global financial crisis, the Bank was nationalized

by the Republic of Ireland in 2009.  Plaintiffs seek declaratory and injunctive relief related to

their claim that the Bank has breached an agreement governing the notes by selling off its U.S.-

based assets and merging with another entity.

              On February 14, 2011, Plaintiffs moved – by order to show cause – for a

preliminary injunction:

> (a) enjoining Defendant from consolidating with or merging with or into, or
> selling, leasing or otherwise disposing of its assets as an entirety or
> substantially as an entirety to any Person (as defined in the Note Purchase
> Agreement ("NPA")), except as may be permitted by Section 9.3 of the NPA
> (in particular, the Solvency Condition, the Assumption Condition, and the
> Opinion of Counsel Condition, as those terms are defined in the Complaint);
>
> (b) requiring Defendant to leave in the United States assets totaling at least the
> amount necessary for Anglo Irish Bank to satisfy its obligations under the
> NPA and the Notes, to wit, no less than $200,000,000, absent demonstrated

> compliance with the Solvency Condition, Assumption Condition, and Opinion of Counsel Condition; and,
>
> (c) appointing a Receiver to take charge of Defendant's assets located in the United States, up to and including an amount necessary for Defendant to comply with its performance obligations under the NPA, to wit, no less than $200,000,000. . . .

(Feb. 14, 2011 Order to Show Cause for Preliminary Injunction and Temporary Restraining Order at 1-2)

On March 2, 2011, this Court conducted a hearing concerning Plaintiffs' motion. At that hearing, the Court requested briefing concerning the question of whether the Foreign Sovereign Immunities Act ("FSIA") prohibits the relief Plaintiffs seek.[1]

After the parties filed the first round of supplemental briefs, Plaintiffs submitted a series of letters to the Court dated March 18, 2011, May 20, 2011, June 20, 2011, and June 24, 2011, asking this Court to hold a hearing in light of "urgent" events, including the potential sale of U.S.-based assets and an impending merger between Anglo Irish Bank and another bank, the Irish National Building Society ("INBS").

On August 1, 2011, the Court conducted an evidentiary hearing concerning the Bank's sale of assets and merger with INBS, and heard argument on, inter alia, whether these events justify application of the commercial activity exception to sovereign immunity under the FSIA. After the August 1 hearing, the parties submitted a second round of supplemental briefing. Additional letter briefs followed. (See, e.g., October 14, 2011 Smith Ltr.; October 18,

---

[1] A district court must consider whether it has subject matter jurisdiction even where neither side has challenged jurisdiction. Jones v. IndyMac Fed. Bank, No. 08-CV-5215 (JS)(ARL), 2009 WL 2762815, at *2 (E.D.N.Y. Aug. 24, 2009) ( "The Court considers sua sponte its subject-matter jurisdiction over this case, '"as [it is] obliged to do [irrespective of whether either party raises the issue] when it is questionable."'" (alterations in original) (quoting United States v. Frias, 521 F.3d 229, 231 (2d Cir. 2008)); Seldon v. Bernstein, No. 09 Civ. 6163(AKH), 2010 WL 3632482, at *1 (S.D.N.Y. Sept. 16, 2010) ("I find that I lack subject-matter jurisdiction and sua sponte dismiss the complaint under Rule 12(b)(1).").

2011 Stuart Ltr.; Nov. 1, 2011 Smith Ltr.; Nov. 3, 2011 Stuart Ltr.)  The case has been a moving target since it was filed, both as to the facts – which have rapidly changed – and the legal authorities that the parties rely on.

Having considered the numerous rounds of briefing and the evidence and argument presented at the March 2, 2011 and August 1, 2011 hearings, as well as the entire record in this case, the Court concludes – for the reasons stated below – that the FSIA prohibits the relief sought in the Amended Complaint.  Accordingly, this Court lacks subject matter jurisdiction, the motion for a preliminary injunction must be denied, and this action will be dismissed.  This opinion constitutes this Court's findings of fact and conclusions of law.

## BACKGROUND

In 2005, Plaintiffs – two limited partnerships headquartered in the Cayman Islands – purchased $200 million in notes issued by the Bank (the "Notes"), which is incorporated under the laws of the Republic of Ireland.  (Am. Cmplt. ¶¶ 1, 15-17; Meyer Decl. ¶ 6)  The Notes were purchased pursuant to a Note Purchase Agreement ("NPA") dated September 28, 2005.  The Notes are payable in New York, and the NPA is governed by New York law.  (Am. Cmplt. ¶ 1, Meyer Supp. Decl., Ex. A (Note Purchase Agreement) § 19.7)

As a result of the 2008 global financial crisis, the Irish government took steps to stabilize and preserve the nation's banking system to prevent the collapse of the country's economy.  (Bradley Decl. ¶ 2)[2]  To that end, the Irish government guaranteed all of the Bank's liabilities, injected $29 billion in capital into the Bank, and – in January 2009 – nationalized the Bank.  (Am. Cmplt. ¶¶ 2, 17; Aug. 1, 2011 Tr. 13)  Since January 21, 2009, the Irish government has owned 100% of the Bank's shares.  (Am. Cmplt. ¶ 17; Bradley Decl. ¶ 9)

---

[2]  James Bradley is the interim Chief Financial Officer of Anglo Irish Bank and is responsible for finance, tax, and treasury activities at the Bank.  (Aug. 1, 2011 Tr. at 61)

Plaintiffs allege that, soon after the Bank was nationalized, it breached certain provisions of the NPA addressing noteholder rights in the event of consolidation, merger, or disposition of assets.  Plaintiffs also contend that the Irish government has taken steps that put the "most basic and fundamental Agreement rights, including the collection of scheduled payments, the ability to seek legal recourse, and the protections of New York law" at peril.  (Pltf. Feb. 24, 2011 Br. at 4)

## I.     THE NOTE PURCHASE AGREEMENT

The parties to the NPA are purchasers of the notes and the Bank.  (Meyer Supp. Decl. Ex. A (Note Purchase Agreement))  The Republic of Ireland is not a party to the NPA (id.), nor did the Irish government have a controlling interest in the Bank when Plaintiffs purchased the Notes in 2005.  (See Bradley Decl. ¶ 9; Meyer Decl. ¶ 19)

With respect to payment of principal and interest, the NPA provides:

> *Section 9.1. Payment of Principal, Interest and Premium; to Keep Books; Ranking.*  The Company will duly and punctually pay the principal of and interest and premium, if any, on the Notes in accordance with the terms of the Notes and this Agreement.  The Company will ensure that, at all times, all obligations and liabilities of the Company under this Agreement and the Notes will rank in right of payment either *pari passu* or senior to all other Subordinated Indebtedness.

(Meyer Supp. Decl., Ex. A, (Note Purchase Agreement) § 9.1)  The parties agree that, to date, the Bank has satisfied all of its payment obligations under the NPA.[3]  (Meyer Decl. ¶ 10; Bradley Decl. ¶ 39; Aug. 1, 2011 Tr. 23, 85; Nov. 3, 2011 Stuart Ltr.)

As to dispute resolution, the NPA contains a forum selection clause providing for the exercise of in personam jurisdiction in New York:

---

[3]  Moreover, the record supports Defendant's argument that "[i]t is only as a result of the significant capital contributions by the Government of Ireland that the Note holders now have the prospect of receiving payment on the Notes.  Absent such capital injections there was little likelihood of the Notes being repaid at all."  (Bradley Decl. ¶ 18)

. . . ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR
RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER
DOCUMENT EXECUTED IN CONNECTION HEREWITH, OR ANY LEGAL
ACTION OR PROCEEDING TO EXECUTE OR OTHERWISE ENFORCE
ANY JUDGMENT OBTAINED AGAINST THE COMPANY, FOR BREACH
HEREOF OR THEREOF, OR AGAINST ANY OF ITS PROPERTIES, MAY
BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK BY ANY PURCHASER OR ON BEHALF OF SUCH
PURCHASER OR BY OR ON BEHALF OF ANY HOLDER OF A NOTE, AS
SUCH PURCHASER OR HOLDER MAY ELECT, AND THE COMPANY
HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE
NON-EXCLUSIVE JURISDICTION OF SUCH COURTS FOR PURPOSES OF
ANY SUCH LEGAL ACTION OR PROCEEDING.

(Meyer Supp. Decl., Ex. A (Note Purchase Agreement) §19.5 (capitalization in original))

Plaintiffs claim that the Bank has breached three conditions set forth in § 9.3 of

the NPA:  (1) the "Solvency Condition"; (2) the "Assumption Condition"; and (3) the "Opinion

of Counsel Condition":

*Consolidation, Merger or Disposition of Assets.*  The Company will not
consolidate with or merge with or into, or sell, lease or otherwise dispose of its
assets as an entirety or substantially as an entirety to, any Person, unless

(i)  the surviving entity of such consolidation or merger or the transferee of such
assets (x) is a solvent Person organized under the laws of any OECD Member
State or any jurisdiction therein and (y) if other than the Company, (1) expressly
assumes in writing all obligations of the Company under this Agreement and the
Notes and (2) causes to be delivered to each holder of Notes an opinion of
independent counsel reasonably satisfactory to the Holders of at least 51 % in
aggregate principal amount of the Notes, to the effect that the agreements or
instruments effecting such assumption are enforceable in accordance with their
terms and comply with the terms hereof; and

(ii) in the case of any such transaction after giving effect thereto no Default or
Event of Default shall have occurred and be continuing.

(Meyer Supp. Decl., Ex. A (Note Purchase Agreement) §9.3)

Finally, § 11.3 of the NPA provides for the following remedies in the

event of breach:

> *Suits for Enforcement.* If any Default or Event of Default or other breach or
> violation of this Agreement or the Notes shall have occurred and be continuing,
> the holder of any Note may proceed to protect and enforce its rights, either by suit
> in equity or by action at law, or both, whether for the specific performance of any
> covenant or agreement contained in this Agreement or in aid of the exercise of
> any power granted in this Agreement, or the holder of any Note may proceed to
> enforce the payment of all sums then due and owing upon such Note or to enforce
> any other legal or equitable right (whether now existing or hereafter available), of
> the holder of such Note provided, however, that any holder of a Note shall not
> have any power or right to accelerate the right to repayment of the principal of the
> Notes except as provided in §11.1

(Meyer Supp. Decl., Ex. A (Note Purchase Agreement) §11.3)

While the NPA envisions the possibility of consolidation, merger, or a transfer of the Bank's assets "as an entirety or substantially as an entirety," it does not directly address the ramifications of a nationalization.

## II.    POST-NATIONALIZATION EVENTS

Plaintiffs allege that soon after Ireland nationalized the Bank in January 2009, it began to "liquidate its assets at steep discounts," selling "tens of billions of euros in assets to a special purpose vehicle at discounts ranging from 54% to 66%." (Am. Cmplt. ¶ 3)

In December 2009, the Irish government enacted the National Asset Management Agency Act of 2009 (the "NAMA Act"). (Bradley Decl. ¶ 12) "The NAMA Act enables participating Irish financial institutions to sell qualifying illiquid loans to the National Asset Management Agency ("NAMA"), a government-created body, and, in exchange, receive liquid, Government-guaranteed securities." (Bradley Decl. ¶ 12) The Government-guaranteed securities – referred to as "NAMA bonds" – are to be used by participating banks as collateral for short-term funding. (Id.) During 2010, the Irish government purchased approximately €34 billion in non-performing loans from the Bank in exchange for approximately €13 billion in NAMA bonds. (Bradley Decl. Ex. 16 (Nolan Decl.) ¶ 47; Aug. 1, 2011 Tr. 70-72) In addition,

during 2009 and 2010, respectively, the Irish government injected €4 billion (US $5.4 billion) and €25.3 billion (US $34.3 billion) in capital into the Bank.  (Bradley Decl. ¶¶  10-11, Ex. 16 (Nolan Decl.) ¶ 43;  Aug. 1, 2011 Tr. 66; Supp. Bradley Decl. ¶¶ 8-9)

The NAMA program provided the only vehicle by which the Bank could obtain value for the non-performing loans that were transferred:

Q.  Was there a market outside of the NAMA program for these loans?

A.  If there was, I was not aware of it.  I mean, these are very problematic loans. And I suggest it was the only, only avenue for the Irish banks in terms of getting any value in that, in the marketplace at that point in time.

(Aug. 1, 2011 Tr. 69)

In December 2010, the Irish government enacted the Credit Institutions Stabilisation Act.  (Am. Cmplt. ¶ 29)  According to Plaintiffs, the Act permits the Irish Minister for Finance to obtain, on an ex parte basis, orders from the High Court of Ireland to, inter alia, "make proposed direction orders or subordinated liabilities orders without providing notice." (Am. Cmplt. ¶ 31)  Plaintiffs argue that "once a subordinated liabilities order is effective, . . . [it would] eliminate any contractual or equitable remedies that creditors such as Noteholders may have – including the right to commence proceedings against the relevant institution, to bring petitions to wind up the relevant institution, or to exercise a right of set-off against the relevant institution."  (Am. Cmplt. ¶ 32)

The Bank disputes Plaintiffs' interpretation of the Act and its significance:

Firstly, the Credit Stabilisation Act does not, simply by its existence, expressly modify or eliminate the terms of agreements governed by laws outside of the Republic of Ireland (or in certain circumstances, those of other members of the European Economic Area).  Secondly, to the extent that the rights of any subordinated creditor are modified by a "subordinated liabilities order" under the terms of the Credit Stabilisation Act, there are express rights for such a creditor to apply to have such an order set aside, varied or amended on various grounds. Thirdly, no "subordinated liabilities order" has been made.

(Bradley Decl. ¶ 26)

On February 8, 2011, the High Court of Ireland issued an order (the "February 8 Order") directing the Bank to, inter alia, sell certain of the Bank's deposits and assets and begin to "formulate a detailed steps plan for the acquisition of and/or merger with [INBS] and deliver it to the [National Treasury Management Agency] no later than 31 March 2011." (Am. Cmplt., Ex. E (Feb. 8, 2011 Order) ¶¶ 5.2.5, 5.2.1, 5.2.2, 5.2.3, 5.2.4)  In compliance with the February 8 Order, the Bank sold €12.2 billion of government-guaranteed securities to Allied Irish Bank in exchange for the assumption of the Bank's €8.6 billion of deposit liabilities and a €3.5 billion payment.  (Am. Cmplt. ¶¶ 27, 40)

On June 20, 2011, Plaintiffs moved to supplement the record to add certain news reports indicating that the Bank was in the process of selling certain U.S.-based assets, including (1) a $300 million note related to a hotel in Manhattan, allegedly being sold for $190 million (Meyer Second Supp. Decl. ¶ 2, Ex. 1); and (2) a $147 million construction loan related to condominiums in lower Manhattan, allegedly sold for $80 million.  (Id. ¶ 3, Ex. 2).  These news reports also indicated that the Bank had appointed an agent to sell its entire  U.S. loan portfolio, totaling approximately €10.7 billion (id. ¶ 5), and that the Bank was working towards a July 1, 2011 "merger" with INBS, another financial institution that has been nationalized by the Irish government.  (Id. ¶ 15)

At the August 1, 2011 hearing, the Court received additional evidence concerning the Bank's merger with INBS and its disposal of its U.S. loan portfolio.  James Bradley, the Bank's interim Chief Financial Officer, testified that the Bank was in the process of marketing its approximately $10 billion U.S.-based loan portfolio and planned a winding down of the Bank

over the next seven to ten years.  (Aug. 1. 2011 Tr. 39-40, 43-44)  Bradley also testified that the

Bank had merged with INBS:

> Q.  Also, since this case began, Anglo Irish has merged with another bank, is that correct?
>
> A.  We were instructed to merge on the 1st of July.
>
> Q.  And the bank you merged with is another Irish bank called Irish Nationwide Building Society?
>
> A.  That's correct.
>
> Q.  And under the directives of the Irish government, that bank is also being wound down, is that correct?
>
> A.  It's part of Anglo now, and, in fact, when we call it a merger, the assets and liabilities were transferred into Anglo Irish, so I know it's referred to as a merger, but technically I don't know if that's a merger or not.  It was a transfer of assets by, once again, the Irish court instructing INBS to transfer their assets and liabilities into Anglo.
>
> Q.  And now that all those assets are into Anglo, they're being wound down just like the Anglo assets, is that correct?
>
> A.  Over that seven to ten-year period, that's correct.

(Aug. 1. 2011 Tr. 49)

Recent press reports submitted by Plaintiffs indicate that the Bank may

complete the sale of its U.S.-based loan portfolio as early as the end of November 2011.

(Nov. 1, 2011 Smith Ltr.)

## DISCUSSION

Defendants contend that this action must be dismissed because (1) Plaintiffs cannot

"overcome the presumption of immunity afforded Anglo Irish as a 'foreign state'" (Def. First

Supp. Br. 1); and (2) Plaintiffs' requested relief "constitutes a prohibited pre-judgment

attachment [that] is precluded by operation of the FSIA."  (Def. Br. 8)  Plaintiffs argue, however,

9

that "(1) the Court has jurisdiction because the Bank waived immunity and because Noteholders'

claims are based on the Bank's commercial activities; and (2) Noteholders seek injunctive relief

– not an attachment – so that the Bank is not immune; and, in any event, the Bank waived

immunity from attachment by consenting in the [NPA] to actions against its properties."  (Pltf.

First Supp. Br. 5)

          Under 28 U.S.C. § 1330(a), federal district courts have subject matter jurisdiction

over "any nonjury civil action against a foreign state as defined in [28 U.S.C.] section 1603(a)

. . . as to any claim for relief in personam," but the scope of the district court's jurisdiction is

limited to actions for "which the foreign state is not entitled to immunity either under [28 U.S.C.]

sections 1605-1607 . . . or under any applicable international agreement."  28 U.S.C. § 1330(a).

"Under the [FSIA], a foreign state is presumptively immune from the jurisdiction of United

States courts; unless a specified exception [in the Act] applies, [or an international agreement

extant when the FSIA was enacted provides otherwise,] a federal court lacks subject-matter

jurisdiction over a claim against a foreign state."  Saudi Arabia v. Nelson, 507 U.S. 349, 355

(1993) (citing Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488-489 (1983); 28

U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party

at the time of the enactment of [the FSIA] a foreign state shall be immune from the jurisdiction

of the courts of the United States. . . .")

          The issue here thus turns on whether the Bank is a "foreign state" under the FSIA

and, if so, whether a treaty obligation or statutory exception to the immunity provided by the

FSIA applies.  Where a defendant is a "foreign state" within the meaning of the FSIA and no

statutory exception to sovereign immunity or treaty obligation provides a basis for subject matter

jurisdiction, the action must be dismissed.  See, e.g., Commercial Corp. Sovrybflot v.

Corporacion de Fomento de la Produccion, 980 F. Supp. 710, 711 (S.D.N.Y. 1997) (applying FSIA and dismissing case for lack of subject matter jurisdiction); Exch. Nat'l Bank of Chi. v. Empresa Minera Del Centro Del Peru S.A., 595 F. Supp. 502, 503 (S.D.N.Y. 1984) (same).

## I. "FOREIGN STATE" DETERMINATION

Under the FSIA, a "foreign state . . . includes . . . an agency or instrumentality of a foreign state." An "agency or instrumentality of a foreign state" is defined to include "any entity":

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>
> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b) (2006) (emphasis added).

Courts commonly find a commercial bank wholly owned by a foreign state to be "an agency or instrumentality of a foreign state." See, e.g., Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 239 (2d Cir. 1994) (finding that "a commercial bank wholly owned by the Republic of Iraq," is an "agency or instrumentality of a foreign state" under the FSIA); Rosner v. Bank of China, 528 F. Supp. 2d 419, 422, 424 (S.D.N.Y. 2007) (finding that "a commercial bank primarily owned by the People's Republic of China" is an "agency or instrumentality of a foreign state" under the FSIA). "Foreign state status is to 'be determined at the time suit is filed.'" Fagan v. Republic of Austria, No. 08 Civ. 6715(LTS)(JCF), 2011 WL 1197677, at *6 (S.D.N.Y. Mar. 25, 2011) (quoting Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003)).

Here, it is undisputed that "all of the shares in Anglo Irish were transferred to Ireland's Minister for Finance" (Bradley Decl. ¶ 9), and the parties do not dispute that the Bank is an instrumentality of the Republic of Ireland for purposes of the FSIA.  (Pltf. Br. 1 n.1 (quoting 28 U.S.C. § 1603(b)); Mar. 2, 2011 Tr. at 7 ("We would not dispute the Court's finding that Anglo Irish is a foreign state for purposes of the [Foreign Sovereign Immunities] Act."); see also Def. Br. 7 ("the relief that the funds seek in the Motion is definitively barred by the provisions of the Foreign Sovereign Immunities Act").  Accordingly, this Court finds that Anglo Irish Bank is an instrumentality of the Republic of Ireland within the meaning of 28 U.S.C. § 1603.

Where, as here, a defendant has demonstrated that it is a foreign state or the instrumentality of a foreign state, "the 'burden then shifts to the plaintiff to present evidence showing that an exception to the FSIA applies.'"[4] Fagan, 2011 WL 1197677, at *6 (quoting Matar v. Dichter, 563 F.3d 9, 12 (2d Cir. 2009)); see also Filetech S.A. v. France Telecom, S.A., 212 F. Supp. 2d 183, 190 (S.D.N.Y. 2001) ("The FSIA imposes on the parties a shifting burdens regime.  'Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign.'" (quoting Cabiri v. Gov't of the Republic of Ghana, 165 F.3d

---

[4] "'Determining whether this burden is met involves a review of the allegations in the complaint, the undisputed facts, if any, placed before the court by the parties, and – if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue – resolution of disputed issues of facts.'"  Anglo-Iberia, 600 F.3d at 175 (quoting In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 80 (2d Cir. 2008) (internal quotation marks and alterations omitted)).  In doing so, "[t]he district court may look to evidence outside the pleadings and hold an evidentiary hearing, if it believes one is warranted, in resolving the question of jurisdiction."  Anglo-Iberia, 600 F.3d at 175 (citing Filetech S.A., 157 F.3d at 932).

193, 196 (2d Cir. 1999))); H.R.Rep. No. 1487, 94 Cong., 2d Sess. 1, 17, reprinted in 1976

U.S.Code Cong. & Admin.News 6604, 6616 ("[T]he burden will remain on the foreign state to

produce evidence in support of its claim of immunity.  Thus, evidence must be produced to

establish that a foreign state or one of its subdivisions, agencies or instrumentalities is the

defendant in the suit and that the plaintiff's claim relates to a public act of the foreign state – that

is, an act not within the exceptions in sections 1605-1607.  Once the foreign state has produced

such prima facie evidence of immunity, the burden of going forward would shift to the plaintiff

to produce evidence establishing that the foreign state is not entitled to immunity.  The ultimate

burden of proving immunity would rest with the foreign state.")

   Plaintiffs offer two arguments in support of their contention that the Bank is not

immune from suit.  First, Plaintiffs contend that Ireland "waived . . . immunity either explicitly

or by implication."  See 28 U.S.C. § 1605(a)(1).  According to Plaintiffs, Ireland "waived its

agencies' and instrumentalities' sovereign immunity by entering into the 1950 Treaty of

Friendship, Commerce and Navigation with the United States (the 'Friendship Treaty')."  (Pltf.

First Supp. Br. 5)  Plaintiffs further contend that – in nationalizing the Bank in 2009 – Ireland

waived sovereign immunity.  (Pltf. First Supp. Br. 8)

   Second, Plaintiffs argue that the "commercial activity" exception to

immunity under the FSIA applies.  The FSIA provides that "[a] foreign state shall not be

immune from the jurisdiction of courts of the United States . . .  in any case"

> in which the action is based upon a commercial activity carried on in the
> United States by the foreign state; or upon an act performed in the United
> States in connection with a commercial activity of the foreign state
> elsewhere; or upon an act outside the territory of the United States in
> connection with a commercial activity of the foreign state elsewhere and
> that act causes a direct effect in the United States. . . .

28 U.S.C. § 1605(a)(2).  Plaintiffs contend that all three clauses of § 1605(a)(2) are

applicable here.  (Pltf. First Supp. Br. 11-19)

## II.    <u>WAIVER OF SOVEREIGN IMMUNITY</u>

As noted above, a "foreign state" may waive immunity "either explicitly or by

implication . . . ."  28 U.S.C. § 1605(a)(1).  "'[A] waiver will not be implied[, however,] absent

strong evidence of the sovereign's intent.'"  <u>Human Rights in China v. Bank of China</u>, No. 02

Civ. 4361(NRB), 2005 WL 1278542, at *6 (S.D.N.Y. May 27, 2005) (quoting <u>Cargill Intern.

S.A. v. M/T Pavel Dybenko</u>, 991 F.2d 1012, 1017 (2d Cir. 1993)).  "'Federal courts have been

virtually unanimous in holding that the implied waiver provision of Section 1605(a)(1) must be

construed narrowly,'" <u>Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co.,

Kommanditgesellschaft v. Navimpex Centrala Navala</u>, 989 F.2d 572, 577 (2d Cir. 1993)

(quoting <u>Shapiro v. Republic of</u> <u>Bolivia</u>, 930 F.2d 1013, 1017 (2d Cir. 1991)), and waivers

contained in international agreements likewise are accorded a narrow construction.  <u>See</u>, <u>e.g.</u>,

<u>Reers v. Deutsche Bahn AG</u>, 320 F. Supp. 2d 140, 147-48 (S.D.N.Y. 2004) ("Plaintiffs' reading

of § 1605(a)(1) is too broad. . . . Here, Germany's ratification of [a treaty that regulates litigation

arising from railway transportation in signatory countries] constitutes a very narrow waiver of

sovereign immunity:  signatory nations have not consented to suit in any signatory nation, but

only in the courts of the country in which the injury giving rise to the suit occurred.").

"Moreover, it is rare for a court to find that a country's waiver of immunity

extends to third parties not privy to the contract."[5]  <u>Cargill</u>, 991 F.2d at 1017 (citing <u>Zernicek v.

Petroleos Mexicanos</u>, 614 F. Supp. 407, 411 (S.D. Tex. 1985), <u>aff'd</u>, 826 F.2d 415 (5th Cir.

1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1043 (1988))).  "When the case involves an implied waiver . . . a

---

[5] <u>See</u> <u>N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc.</u>, 954 F.2d 847, 852 (2d Cir. 1992)
("A 'treaty' is a contract between nations."  (citing <u>Trans World Airlines v. Franklin Mint Corp.</u>,
466 U.S. 243, 253 (1984)).

court should be even more hesitant to extend the waiver in favor of third parties.  [S]uch a waiver will not be implied absent strong evidence of the sovereign's intent."  Id.

A.   **Friendship Treaty**

The United States and Ireland entered into the "Friendship Treaty" in 1950.  It provides, in pertinent part, that

> [n]o enterprise of either Party which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.

Treaty of Friendship, Commerce and Navigation, U.S. – Ir., art XV(3), Jan. 21, 1950, 1 U.S.T. 785.

Plaintiffs contend that this provision "'undoubtedly [operates as] a waiver of immunity within the meaning of § 1605(a)(1)."  (Pltf. First Supp. Br. 6-7 (internal quotations and citations omitted))  Noting that Plaintiffs are Cayman Island entities, however, the Bank contends that there was no waiver, because the "Treaty inures to the benefit of the parties to the Treaty – i.e., the United States and the Republic of Ireland – and does not purport to extend to parties of a third country, like the Funds."  (Def. First Supp. Br. 7-8 (emphasis in original))  The Bank has the better of the argument.

Plaintiffs have presented no legal authority suggesting that they – as Cayman Islands entities (Am. Cmplt. ¶¶ 15, 16) – are entitled to claim a benefit from a treaty entered into by Ireland and the United States.[6]  "[A]s a general principle of international and United States

_____

[6]  In their second supplemental brief, Plaintiffs cite to Calgarth Invs. Ltd. v. Bank Saderat Iran, No. 95 Civ. 5332 (MBM), 1996 WL 204470 (S.D.N.Y. Apr. 26, 1996) for the proposition that "this Court has previously interpreted nearly identical treaty language as waiving sovereign immunity for suits brought by non-U.S. entities."  (Pltf. Second Supp. Br. 21)  Calgarth involved an Irish corporation suing an Iranian state-controlled bank.  The bank argued that it was immune

law, a treaty creates neither rights nor obligations in regards to a state which is not a party to that treaty (unless, of course, it evinces an intent to do so)." <u>Jet Traders Inv. Corp. v. Tekair, Ltd.</u>, 89 F.R.D. 560, 567 (D. Del. 1981) (non-signatory state held to have no rights under treaty). Here, the Friendship Treaty creates "mutual rights and privileges" running between this nation and Ireland and their citizens. <u>See</u> Treaty of Friendship, Commerce and Navigation, U.S.-Ir., art XV(3), Jan. 21, 1950, 1 U.S.T. 785 ("The United States of America and Ireland, desirous of strengthening the bonds of peace and friendship traditionally existing <u>between them</u> and of encouraging closer economic and cultural relations <u>between their peoples</u>, and being cognisant of the contributions which may be made toward these ends by arrangements <u>establishing mutual rights and privileges</u> and promoting <u>mutually advantageous commercial intercourse</u>, have resolved to conclude a Treaty of Friendship, Commerce and Navigation . . . ." (emphasis added)). Nothing in the text of the Friendship Treaty suggests that Ireland intended to waive immunity as to third-party states or their nationals.

"'[C]ourts rarely find that a nation has waived its sovereign immunity, particularly with respect to suits brought by third parties, without strong evidence that this is what the foreign state intended.'" <u>Sampson v. Fed. Republic of Germany</u>, 250 F.3d 1145, 1150 (7th Cir. 2001) (quoting <u>Frolova v. Union of Soviet Socialist Republics</u>, 761 F.2d 370, 377 (7th Cir. 1985)). Here, there is no evidence that – in entering the Friendship Treaty – Ireland intended to waive sovereign immunity in U.S. courts to suits brought by non-U.S. parties, such

---

from suit, but the court found that Iran had waived immunity pursuant to a 1955 treaty with the United States. <u>Calgarth Invs.. Ltd.</u>, 1996 WL 204470, at *3-*5. The language of the U.S.-Iran treaty is very similar to the Friendship Treaty. <u>Id.</u> at *3. <u>Calgarth</u> is not controlling here, however, because the Iranian bank did not raise, and the court did not address, whether a creature of a third country – in that case, an Irish corporation – could assert rights under a treaty between the U.S. and Iran.

as Plaintiffs, which are Cayman Islands entities.  Accordingly, this Court will not find waiver on that basis.

      **B.**      <u>Note Purchase Agreement Choice of Forum/Law Provisions</u>

      As noted above, in the NPA the Bank consents to the jurisdiction of New York courts and to the application of New York law in connection with any legal proceeding brought for breach of the NPA.  (Meyer Supp. Decl., Ex. A (Note Purchase Agreement) §§ 19.5, 19.7)  Plaintiffs contend that because the Bank – then a private entity – agreed to these provisions in 2005 when it entered into the NPA, the Irish government – having nationalized the Bank in 2009 – should now be held to have waived sovereign immunity.  (Pltf. First Supp. Br. 8)  None of the cases cited by Plaintiffs support their argument.

      In <u>Belize Telecom Ltd. & Innovative Commc'n Co. v. Gov't of Belize</u>, No. 05-20470-CIV, 2005 WL 5643879, at *6 (S.D. Fla. Aug. 17, 2005), <u>rev'd in part on other grounds</u>, 528 F.3d 1298 (11th Cir. 2008), for example, the parties to an underlying contract – the "Share Pledge Agreement" – had agreed that the U.S. District Court for the Southern District of Florida would have jurisdiction to hear all suits and actions arising out of the agreement.  The government of Belize then expressly agreed to "assume[] all of the Assignor's [] right, title and interest in and to the Share Pledge Agreement and agree[d] to perform, comply with and be subject to and bound by the Share Pledge Agreement in all respects."  <u>Id.</u>  Under these circumstances, the court found that "the Government [had] contractually agreed to submit to this Court's jurisdiction by entering into the Assignment Agreement in which the Government assumed all of the rights and obligations of [the bank] under the Share Pledge Agreement."  <u>See</u> <u>Belize Telecom</u>, 2005 WL 5643879, at *13.  Here, in contrast, there is no evidence that the Irish government agreed to be bound by the choice of forum/law provisions of the NPA.  It was the

17

"Bank [and only the Bank that] consented to this Court's jurisdiction and agreed to waive any objections to venue lying in this Court."  (Am. Cmplt. ¶ 20)

Plaintiffs' reliance on Aguas Lenders Recovery Group v. Suez, S.A., 585 F.3d 696, 701 (2d Cir. 2009) is likewise misplaced.  In that case the Second Circuit considered "whether, for the purposes of the doctrine of forum non conveniens, a non-signatory to an agreement may be bound by a forum selection clause and forum non conveniens waiver contained in contracts entered into by an entity alleged to be a predecessor in interest."  Aguas Lenders Recovery Group, 585 F.3d at 697.  The Court expressly did not "reach the parties' additional arguments regarding whether [appellant's] claims [were] . . . barred under the Foreign Sovereign Immunities Act."  Id. at 703.  In short, Aguas Lenders provides no support for Plaintiffs' argument that a "foreign state" can be found to have waived sovereign immunity when it nationalizes a private entity that previously entered into an agreement containing forum selection and governing law provisions.

The Boeing Co. v. EgyptAir (In re Air Crash near Nantucket Island, Mass., on Oct. 31, 1999), 392 F. Supp. 2d 461, 469 (E.D.N.Y. 2005), aff'd in rel. part, No. 05-5986-CV, 2007 WL 1315716 (2d Cir. May 7, 2007) likewise does not support Plaintiffs' position.  In that case, EgyptAir's insurer and subrogee – MISR – was held to be an instrumentality of Egypt for purposes of the FSIA.   See EgyptAir, 392 F. Supp. 2d at 467.  The district court found that EgyptAir had expressly waived sovereign immunity in obtaining its Foreign Air Carrier Permit, and that "[a]s EgyptAir's subrogee, MISR is subject to jurisdiction under the waiver exception since it stands in EgyptAir's shoes."  Id. at 469.  Here, unlike in EgyptAir, the Bank was not an instrumentality of a foreign state when it entered into the NPA.  (See Bradley Decl. ¶ 9; Meyer Decl. ¶ 19)

In sum, Plaintiffs have cited no case suggesting that a nationalized entity may be found to have waived sovereign immunity because of an agreement entered into by its private sector predecessor.  At bottom, Plaintiffs' argument is that this Court should find that Ireland impliedly waived sovereign immunity simply by virtue of having nationalized the Bank, because the Bank, as a private entity, agreed in the NPA to the jurisdiction of New York courts and the application of New York law.  As noted above, however, "'a waiver will not be implied absent strong evidence of the sovereign's intent.'"  See Human Rights in China, 2005 WL 1278542, at *6 (quoting Cargill, 991 F.2d at 1017).  There is no evidence of such an intent here. Accordingly, this Court finds that Ireland did not waive sovereign immunity when it nationalized the Bank.

## III.    APPLICABILITY OF THE FSIA'S COMMERCIAL ACTIVITY EXCEPTION

### A.    Statutory Background

Having concluded that the Irish government has not waived sovereign immunity for purposes of this action, the Court must consider whether one or more categories under the FSIA's "commercial activity" exception provide a basis for this Court's exercise of subject matter jurisdiction.

The Foreign Sovereign Immunities Act provides that a

foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . .

> in which the action is based upon [i] a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. . . .

28 U.S.C. § 1605(a)(2) (emphasis added).  The purpose of the commercial activity exception is to "prevent[] foreign states from hiding behind their sovereignty when acting as market participants."  Southway v. Central Bank of Nigeria, 994 F.Supp. 1299, 1307 (D.Colo. 1998).

> Under the FSIA, a
>
> "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or a particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d).  As used in Section 1603(d), a "'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States."  28 U.S.C. § 1603(e).

"As is plain from the language of . . . section [1605(a)(2)], each of its three clauses describes different categories of conduct for which the foreign state is denied immunity." Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010).  Here, Plaintiffs contend that each of the three categories set forth in the "commercial activity" exception provide a basis for the exercise of subject matter jurisdiction.

### B.   Alleged Commercial Activity Giving Rise to Plaintiffs' Claim

"The first step in evaluating a claim under the FSIA, before attempting to characterize that act or activity as governmental or commercial, is to define with precision the activity, and the act in connection with that activity, that [gives] rise to plaintiff's claim."  Braka v. Bancomer, S.A., 589 F. Supp. 1465, 1469 (S.D.N.Y. 1984); see also Garb v. Republic of Poland, 440 F.3d 579, 586 (2d Cir. 2006) ("As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception," we must first "identify the act of [the "foreign state"] that serves as the basis for plaintiffs' claims.").

### 1.    **Pre-Nationalization Acts**

Plaintiffs seek to rely both on acts that occurred prior to Ireland's nationalization of the Bank – including the Bank's execution of the NPA and sale of the notes (see Pltf. First Supp. Br. 12) – and post-nationalization acts, including the sale of U.S.-based assets and the merger with INBS.  (Id. at 16).  It is undisputed that the Bank was not a foreign state or instrumentality when it executed the NPA and sold notes in the United States.  These pre-nationalization acts may not serve as the basis for Plaintiff's commercial activity exception argument, because actions of the Bank at that time were not the acts of a foreign state or instrumentality, and there is no claim that the Bank was already in breach prior to nationalization.  See Anglo-Iberia Underwriting Mgmt., 600 F.3d at 177 (citing Garb, 440 F.3d at 586 ("As a threshold step in assessing plaintiffs' reliance on the 'commercial activity' exception, we must identify the act of the foreign sovereign State that serves as the basis for plaintiffs' claims." (emphasis added)). [7]

---

[7]  The cases Plaintiffs cite (Pltf. Br. 13) – most of which arise from Mexico's nationalization of banks in 1982 – do not demonstrate that this Court may rely on pre-nationalization events in determining whether the commercial activity exception to the FSIA applies.  None of these cases analyze whether a pre-nationalization act may serve as a basis for applying the commercial activity exception.  Moreover, to the extent that these cases contain any discussion of the issue, these remarks are dicta, because the courts dismiss these actions on other grounds.

Braka v. Bancomer, S.A., 589 F. Supp. 1465, 1468 (S.D.N.Y. 1984) sheds no light on the issue, because the defendant bank "was a state instrumentality as defined by the FSIA at the time of th[e] lawsuit as well as at the time the act on which th[e] suit is based took place."  Similarly, Abrams v. Société Nationale des Chemins de Fer Français, 175 F. Supp. 2d 423 (E.D.N.Y. 2001), aff'd, 389 F.3d 61 (2d Cir. 2004), provides no support for Plaintiffs' position.  The defendant railroad was "wholly owned by the government of France" during the relevant time period and plaintiffs did not "even seek to make out a basis for jurisdiction under the FSIA." Abrams, 175 F. Supp. 2d at 433.

In Braka v. Multibanco Comermex, S.A., 589 F. Supp. 802 (S.D.N.Y. 1984), the court noted that the bank's sale of unregistered securities in the United States falls "generally within the [commercial] exception to the FSIA" and that – because the bank had made false statements in connection with the sale of these securities – plaintiffs' cause of action arose "directly out of

The FSIA speaks of commercial activity "of" or "carried on" by a foreign state, and defines "a commercial activity carried on in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. §§ 1605(a)(2), 1603(e). Permitting pre-nationalization acts to serve as the basis for application of the commercial activity exception is inconsistent with the plain language of the FSIA, which speaks to commercial activity "of" or "carried on" by a "foreign state" in the present tense.[8] See 28 U.S.C. § 1605(a)(2). The plain language of the statute does not suggest

---

defendant's commercial activity and thereby fall[s] within the 'commercial activity' exception to the FSIA." Braka v. Multibanco Comermex, 589 F. Supp. at 805-06. The court does not analyze, however, whether plaintiffs could rely on these pre-nationalization acts in arguing that the commercial activity exception applies. The issue simply is not addressed. The court went on to dismiss the action, finding that plaintiffs' breach claims were barred by the act-of-state doctrine and that their securities law claims were time-barred. Id. at 804-05.

Wolf v. Banco Nacional de Mexico, S.A., 739 F.2d 1458 (9th Cir. 1984), likewise does not address the issue of whether pre-nationalization acts can serve as a basis for applying the commercial activity exception. In that case, a Mexican bank, while privately held, sold a certificate of deposit ("CD") to plaintiff. The bank was nationalized after plaintiff's lawsuit was filed. The court found that the bank's sale of the CD fell within the commercial activity exception to the FSIA, because it "was clearly 'a commercial activity carried on in the United States.'" Wolf, 739 F.2d at 1460 (quoting 28 U.S.C. § 1605(2)). Once again, the court did not address whether a pre-nationalization act can serve as the basis for applying the commercial activity exception. The court went on to dismiss the action, holding that the CD was not a security for purposes of federal securities laws. Id. at 1463-64.

In Callejo v. Bancomer S.A., 764 F.2d 1101, 1105 (5th Cir. 1985), and West v. Multibanco, 807 F.2d 820 (9th Cir. 1987), appellate courts affirmed dismissals of plaintiffs' actions alleging, respectively, breach of contract and violations of the federal securities laws. Both courts held that these actions were barred by the act-of-state doctrine. In ruling that the defendant banks were not immune from suit under the FSIA, neither court addressed whether pre-nationalization acts could be relied on to justify application of the commercial activity exception.

[8]  In interpreting the FSIA, the Supreme Court has attributed significance to Congress' use of tense. In Dole Food Co. v. Patrickson, 538 U.S. 468, 478 (2003) the Supreme Court considered § 1603(b) of the FSIA, which defines "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(b)(2) ("any entity . . . which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . .") (emphasis added)  The Court found that because the statute is written in

that Congress intended courts to consider – in determining the applicability of the commercial

activity exception – activities carried on by a private entity years before it was nationalized.[9]

> In any event, in determining the applicability of the commercial activity
exception, this Court must look to "the act of the foreign sovereign State that serves as the basis
for plaintiffs' claims."  Anglo-Iberia, 600 F.3d at 177; see also Gould, Inc. v. Pechiney Ugine
Kuhlmann, 853 F.2d 445, 450 (6th Cir. 1988), overruled on other grounds by Republic of
Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992) ("It must be borne in mind that the
commercial activity relied upon by plaintiff for jurisdictional purposes must be also the activity
upon which the lawsuit is based. . . ."; see also Daly v. Castro Llanes, 30 F.Supp.2d 407, 417
(S.D.N.Y. 1998) (applicability of FSIA and commercial activity exception turn on whether
plaintiff's cause of action arises from post-nationalization acts; no immunity "where the
activities underlying the complaint were all committed by the defendant and its owners when the
defendant was not a state entity but rather was a private commercial bank"); Nordberg v.
Granfinanciera, SA (In re Chase & Sanborn Corp.), 835 F.2d 1341, 1347-48 (11th Cir. 1988),
reversed on other grounds, 492 U.S. 33 (1989) (no immunity where corporation was nationalized
by the Colombian government after alleged fraudulent transfers took place; "Granfinanciera was
not an instrumentality of the Colombian government at time of the transactions and would not be
protected by the provisions of [the] FSIA").

---

the present tense, agency or instrumentality status should be determined as of the time the
complaint is filed.  Id. at 478.

[9]  Courts have found no immunity where a private entity breached an agreement or defrauded an
investor and was later nationalized by a foreign government.  See, e.g., Daly v. Castro Llanes, 30
F.Supp.2d 407, 417 (S.D.N.Y. 1998) ("policies underlying the FSIA . . . do not call for immunity
in a situation where the activities underlying the complaint were all committed by the defendant
and its owners when the defendant [entity] was not a state entity but rather was a private,
commercial [entity]"; Nordberg v. Granfinanciera, SA (In re Chase & Sanborn Corp.), 835 F.2d
1341, 1347-48 (11th Cir. 1988), reversed on other grounds, 492 U.S. 33 (1989).  There is no
claim here, however, that the Bank breached the NPA prior to nationalization.

Here, Plaintiffs' breach claims arise from the Bank's post-nationalization acts, including its transfer of billions of dollars in non-performing loans to NAMA in exchange for NAMA bonds, its merger with INBS, and its planned sale of its U.S.-based loan portfolio. Accordingly, the Court will next consider whether the post-nationalization acts cited by Plaintiffs are commercial or sovereign in nature.

### 2.        Nature of the Bank's Alleged Post-Nationalization Acts

The Amended Complaint alleges that the Bank breached § 9.3 of the NPA by pursuing a plan to consolidate with or merge into the INBS, given that the INBS is not a solvent entity, is not an investment grade institution, and has not agreed to assume all liabilities under the NPA.  (Am. Cmplt. ¶ 8).  The Amended Complaint further alleges that the Bank breached its promise in § 9.3 of the Agreement not to sell or "otherwise dispose of its assets as an entirety or substantially as an entirety" by selling certain assets at a steep discount, including selling €10.1 billion of assets at a 54% discount in May and June 2010; selling €5.9 billion of assets at a 66% discount in August 2010; selling €18.0 billion of assets at a 66% discount shortly thereafter; and selling €12.2 billion of government-guaranteed securities to Allied Irish Bank in exchange for the assumption of the Bank's €8.6 billion of deposit liabilities and the payment of €3.5 billion on February 24, 2011. (See Am. Cmplt. ¶¶ 8, 27)  Since the filing of the Amended Complaint, Plaintiffs have alleged that the Bank's planned sale of its U.S.-based loan portfolio also constitutes a breach of § 9.3 of the NPA.   (Pltf. Second Supp. Br. 2, 8, 24)

As noted above, "[t]he [FSIA] defines 'commercial activity' to mean 'either a regular course of commercial conduct or a particular commercial transaction or act' and provides that '[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.' § 1603(d).  To determine whether an activity is commercial for the purposes of the FSIA, 'courts

should "inquire whether the activity in question is one which private parties ordinarily perform or whether it is peculiarly within the realm of governments.'"" Fagan, 2011 WL 1197677, at *7 (S.D.N.Y. Mar. 25, 2011) (quoting Rogers v. Petroleo Brasileiro, S.A., 741 F. Supp. 2d 492, 500 (S.D.N.Y. 2010) (quoting Braka v. Bancomer, S.A., 589 F. Supp. 1465, 1469 (S.D.N.Y. 1984))) (citing Weltover, 504 U.S. at 614-15).  Courts ask not

> "whether the foreign [instrumentality] is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives" but rather "whether the particular actions that the foreign [instrumentality] performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"

Anglo-Iberia, 600 F.3d at 177 (quoting Weltover, 504 U.S. at 614) (citing Nelson, 507 U.S. at 360-61) (emphasis in original).

As an initial matter, the Bank contends that the acts cited by Plaintiffs do not constitute "commercial activity" because the Bank was "compelled to follow Irish law and orders of the High Court," which directed it to "formulat[e] a 'detailed steps plan' as contemplated in the [Irish government's] Direction Order, and transfer[] assets as contemplated in the [Irish government's] Transfer Order." [10]  (Def. First Supp. Br. 13 (citations omitted))

---

[10]  The Bank's argument that the Irish government compelled the post-nationalization actions cited by Plaintiffs is evocative of the act-of-state doctrine.  "The act of state doctrine prevents U.S. courts from inquiring into the validity of the public acts of a recognized sovereign power committed within its own territory."  Sarei v. Rio Tinto, 487 F.3d 1193, 1208 (9th Cir. 2007) (citing Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964)).  Under this doctrine, "an action may be barred if (1) there is an 'official act of a foreign sovereign performed within its own territory'; and (2) 'the relief sought or the defense interposed [in the action would require] a court in the United States to declare invalid the [foreign sovereign's] official act.'"  Id. (quoting Sabbatino, 376 U.S. at 405).  Where applicable, the act-of-state doctrine renders a cause of action non-justiciable.  See, e.g., Braka v. Multibanco Comermex, S.A., 589 F. Supp. at 804.

The Bank has not argued that the act-of-state doctrine applies.  Where, as here, a debt instrument is payable in New York, courts have found that the act-of-state doctrine does not bar suit.  See, e.g., Allied Bank v. Banco Credito, 757 F.2d 516, 522 (2d Cir. 1985) (holding that act-of-state doctrine did not bar action where notes were payable in New York).

Assuming arguendo that the Bank acted under compulsion from the Irish government, it does not follow that the Bank engaged in sovereign rather than commercial activity.  Indeed, because a foreign instrumentality such as a nationalized or central bank presumably always acts at the volition of a foreign government, were this Court to accept the Bank's argument, the commercial activity exception would be rendered nugatory.  Accordingly, this Court must consider whether the actions Plaintiffs cite – including the 2010 disposal of billions of euros of loans pursuant to the NAMA Act, the merger with INBS, and the planned disposal of the U.S.-based loan portfolio – are sovereign or commercial in nature.  See Am. Cmplt. ¶¶ 8, 10, 37; Pltf. Second Supp. Br. 2.

This Court concludes that each of these acts is commercial rather than sovereign in nature.  The sale of non-performing loan assets to NAMA – which purchased them at a significant discount with NAMA bonds – the merger with INBS, and the sale or planned sale of U.S.-based loans all constitute "the type of actions by which a private party engages in 'trade and traffic or commerce.'"  Anglo-Iberia, 600 F.3d at 177 (quoting Weltover, 504 U.S. at 614) (emphasis in original).  Stated another way, these are activities that "private parties ordinarily perform" and are not "peculiarly within the realm of governments."  Fagan, 2011 WL 1197677, at *7.  While the Irish government undoubtedly had a sovereign objective in causing the Bank to take these actions, this Court must look to the nature of these acts rather than their purpose.  Id.; Anglo-Iberia, 600 F.3d at 177.  Because the actions at issue are commercial rather than sovereign in nature, this Court must go on to consider whether any of the three clauses set forth in the the "commercial activity" exception of § 1605(a)(2) of the FSIA provides a basis for the exercise of subject matter jurisdiction.

**C.      Clause 1 of the Commercial Activity Exception:  Claim Arising From <u>Commercial Activity Carried on in the United States by a Foreign State</u>**

**1.      <u>Applicable Law</u>**

The first clause of 28 U.S.C. § 1605(a)(2) denies immunity where a plaintiff's claim "is based upon a commercial activity carried on by a foreign state."  "To sustain jurisdiction [under clause 1] . . . 'there must be a significant nexus between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action.'" <u>Filetech S.A.</u>, 212 F. Supp. 2d at 191, <u>aff'd</u>, 304 F.3d 180 (2d Cir. 2002) (quoting <u>Reiss v. Societe Centrale Du Groupe Des Assurances Nationales</u>, 235 F.3d 738, 747 (2d Cir. 2000)).[11] This prong of the commercial activity exception "applies not when the foreign state 'generally engages in commercial activity in the United States,' but when 'the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States.'"[12] <u>Fagan</u>, 2011 WL 1197677, at *7 (quoting <u>Shapiro</u>, 930 F.2d at 1018) (citing 28 U.S.C. § 1603(e); <u>Rogers</u>, 741 F.Supp. 2d 492, 501 (S.D.N.Y. 2010)).

---

[11]   <u>Accord</u> <u>Shapiro v. Republic of Bolivia</u>, 930 F.2d 1013, 1018 (2d Cir. 1991) (noting that the issue under the first clause of § 1605(a)(2) is "whether the particular conduct giving rise to the claim is a part of commercial activity having substantial contact with the United States" (citations omitted)); <u>Am. W. Airlines, Inc. v. GPA Grp., Ltd.</u>, 877 F.2d 793, 796 (9th Cir. 1989) ("There must be a nexus between the defendant's commercial activity in the United States and the plaintiffs' grievance."); <u>Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.</u>, 923 F.2d 380, 387 (5th Cir. 1991) ("In order to satisfy the commercial activities exception to sovereign immunity, the commercial activity that provides the jurisdictional nexus with the United States <u>must also be the activity on which the lawsuit is based</u>." (emphasis added)) (cited in <u>NYSA-ILA Pension Trust Fund By & Through Bowers v. Garuda Indonesia</u>, 7 F.3d 35, 38 (2d Cir. 1993)).

[12]   "The phrase 'substantial contact' is derived from the FSIA, 28 U.S.C. § 1603(e), which defines 'a commercial activity carried on in the United States by a foreign state' as 'commercial activity carried on by such state and having substantial contact with the United States.'"  <u>Filetech S.A.</u>, 212 F. Supp. 2d at 191.  "'Congress left it to the courts to define the contours of 'substantial contact' between a foreign state's commercial activity and the United States,' but 'it is clear that Congress intended a tighter nexus than the 'minimum contacts' standard for due process.'"  <u>Id.</u> (quoting <u>Shapiro</u>, 930 F.2d at 1019).

"Under Section 1605(a)(2), a cause of action is 'based upon' commercial activity or acts performed in the United States" where "plaintiffs have come forward with evidence that [the defendant foreign entity] performed acts in the United States that, if proven, would entitle [plaintiff] to relief." Murphy v. Korea Asset Mgmt. Corp., 421 F. Supp. 2d 627, 647-48 (S.D.N.Y. 2005) (emphasis in original). The Supreme Court has noted that "[a]lthough the Act contains no definition of the phrase 'based upon,' and the relatively sparse legislative history offers no assistance, guidance is hardly necessary." Nelson, 507 U.S. at 357. "In denoting conduct that forms the 'basis,' or 'foundation,' for a claim, see Black's Law Dictionary 151 (6th ed. 1990) (defining 'base'); Random House Dictionary 172 (2d ed. 1987) (same); Webster's Third New International Dictionary 180, 181 (1976) (defining 'base' and 'based'), the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Id. (emphasis added) (citing Callejo v. Bancomer, S.A., 764 F.2d 1101, 1109 (5th Cir. 1985) (focus should be on the "gravamen of the complaint"; "the emphasis should be on the elements of the cause of action itself" in determining jurisdiction); Santos v. Compagnie Nationale Air France, 934 F.2d 890, 893 (7th Cir. 1991) ("We conclude that a claim is 'based upon' events in the United States if those events establish a legal element of the claim. . . . An action is based upon the elements that prove the claim, no more and no less."); Millen Industries, Inc. v. Coordination Council for North American Affairs, 855 F.2d 879, 885 (D.C. Cir. 1988)); see also Verlinden B.V. v. Central Bank of Nigeria, 488 F. Supp. 1284, 1296 (S.D.N.Y. 1980) (Weinfeld, J.) ("the focus must be on the nexus between the forum and the particular facts giving rise to the cause of action"), aff'd on other grounds, 647 F.2d 320 (2d Cir. 1981), rev'd on other grounds, 461 U.S. 480 (1983).[13]

---

[13]  In determining the meaning of "based upon," the Supreme Court noted that

It is Plaintiffs' burden to show that the Bank "performed acts <u>in the United States</u> that, if proven, would entitle [plaintiffs] to relief." <u>Murphy</u>, 421 F. Supp. 2d at 647-48 (emphasis in original).

## 2.    <u>Analysis</u>

Plaintiffs contend that their claims arise from commercial activity carried on in the United States because (1) "the Note payments are due and payable . . . in New York" (Pltf. First Supp. Br. 17 (citing Meyer Supp. Decl. at ¶ 10)); and (2) the Bank is engaged in the "sale[] of U.S.-based assets which are part of the Bank's sale of substantially all of its assets in violation of Section 9.3 of the [NPA]."  (Pltf. First Supp. Br. 16)

With respect to Plaintiffs' first argument, the mere fact that a debt instrument is payable in the United States is not generally sufficient to constitute "commercial activity" under the FSIA.  <u>See</u> <u>Exch. Nat'l Bank of Chi. v. Empresa Minera Del Centro Del Peru S.A.</u>, 595 F. Supp. 502, 504 (S.D.N.Y. 1984) ("Thus, the only potential contacts with the United States includes the fact that the ultimate seller, Caterpillar, exists under the laws of the United States

---

§ 1605(a)(2) contains two clauses following [the first clause].  The second allows for jurisdiction where a suit "is based ... upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," and the third speaks in like terms, allowing for jurisdiction where an action "is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  Distinctions among descriptions juxtaposed against each other are naturally understood to be significant, <u>see</u> <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 94-95 (1991), and Congress manifestly understood there to be a difference between a suit "based upon" commercial activity and one "based upon" acts performed "in connection with" such activity. The only reasonable reading of the former term calls for something more than a mere connection with, or relation to, commercial activity.

<u>Nelson</u>, 507 U.S. at 357-358.

and the fact that the note was made payable in New York.  These two contacts do not satisfy the Act's definition of 'commercial activity.'" (citations omitted)); Verlinden B.V., 488 F. Supp. at 1296) (provision for payment in United States found insufficient to satisfy "based upon" requirement).

Moreover, it is undisputed that the Bank has, to date, made all payments required under the NPA.  Accordingly, Plaintiffs have not demonstrated that there is a "significant nexus" between their right to obtain payment on the Notes in New York and their causes of action.  See Filetech S.A., 212 F. Supp. 2d at 191 (quoting Reiss, 235 F.3d at 747).  In short, the fact that the Notes are payable in New York does not provide a basis for application of the first clause of the commercial activity exception absent proof of non-payment.

Plaintiffs' second theory under clause 1 of the commercial activity exception relates to the Bank's planned sale of its U.S.-based loan portolio.  As noted above, this sale has not yet taken place, but it is undisputed that the Bank has taken substantial steps towards disposing of its U.S.-based assets and it has been alleged that a sale of these loans is imminent. See Nov. 1, 2011 Smith Ltr.  The flaw in Plaintiffs' argument, however, is that even if the Bank sold its entire U.S.-based loan portfolio, it would not be in breach of the NPA.  Accordingly, Plaintiffs' cause of action is not "based upon" this anticipated commercial activity in the United States.

Section 9.3 of the NPA gives certain rights to Plaintiffs in the event that the Bank "sell[s], lease[s] or otherwise dispose[s] of its assets as an entirety or substantially as an entirety to, any Person."  (Meyer Supp. Decl., Ex. A (Note Purchase Agreement) §9.3)  The U.S.-based loan portfolio consists of approximately €10.7 billion in loans and customer advances.  (Meyer Supp. Decl. ¶¶ 21, 32)  The U.S.-based assets

30

represent a fraction of the Bank's total assets, which – as of February 2011 – amounted to

approximately €87 billion.  (Bradley Decl., ¶ 35)  Accordingly, the Bank's sale of all of

its U.S.-based assets would not represent a sale of the entirety or substantially the entirety

of the Bank's assets and thus would not constitute a breach of the NPA.

        During the August 1, 2011 hearing, the Court confirmed this understanding with

Plaintiffs' counsel:

> Q.     Now, you would agree that if the only assets being sold were the U.S. assets, that you wouldn't have an argument that the Bank [is in] breach of Section 9.3.
>
> A.     My understanding of the percentages, that's correct, your Honor, yes.

(Aug. 1, 2011 Tr. 9)  Because it has been conceded that a sale of all of the U.S. assets would not

constitute a breach of the NPA, Plaintiffs have not demonstrated that the Bank has "performed

[or will perform] acts <u>in the United States</u> that, if proven, would entitle [them] to relief."

<u>Murphy</u>, 421 F. Supp. 2d at 648 (emphasis in original); <u>see also</u> 28 U.S.C. § 1605(a)(2) ("A

foreign state shall not be immune from the jurisdiction of courts of the United States or of the

States in any case in which the action is based upon  a commercial activity <u>carried on in the</u>

<u>United States</u> by the foreign state . . . ." (emphasis added)).

        While Plaintiffs argue (Pltf. Second Supp. Br. 11-12, 15) that the expected sale of

U.S.-based assets should be aggregated with overseas transfers that have occurred, or may occur

in the future – in light of the Bank's plan to wind down over the next seven to ten years (<u>see</u>

Aug. 1, 2011 Tr. 39-40, 43-44), they have cited no authority under the FSIA for this proposition,

and their argument flies in the face of case law requiring – for application of clause 1 – that a

plaintiff's cause of action be "based upon" commercial activity in the United States.  <u>Nelson</u>, 507

U.S. at 357  ("based upon" means "those elements of a claim that, if proven, would entitle a

plaintiff to relief under his theory of the case"); <u>Murphy</u>, 421 F. Supp. 2d at 647-48.  In any

event, even if consummated overseas transactions were aggregated with the planned sale of U.S.-

based assets, the record demonstrates that the threshold set in Section 9.3 of the NPA would not

be reached.  <u>See</u> Bradley Supp. Decl. ¶¶ 10, 12.

       Because Plaintiffs have not demonstrated that the Bank has or will engage in

commercial activity in the United States "that, if proven, would entitle [them] to relief," <u>Murphy</u>,

421 F. Supp. 2d at 647-48, clause 1 of the commercial activity exception does not provide a basis

for this Court's exercise of subject matter jurisdiction.

### D.    Clause 2:  Act Performed in the United States in Connection<br>       <u>With a Commercial Activity of the Foreign State Elsewhere</u>

       The Second Circuit has instructed that the

> second prong of the commercial activities exception applies if the plaintiff's
> action is "based . . .  upon <u>an act performed in the United States</u> in connection
> with a commercial activity of the foreign state elsewhere."  28 U.S.C. §
> 1605(a)(2) (emphasis added).  This prong "is generally understood to apply to
> <u>non-commercial</u> acts in the United States that relate to commercial acts abroad."
> <u>Byrd v. Corporacion Forestal y Industrial de Olancho S.A.</u>, 182 F.3d 380, 390
> (5th Cir. 1999) (internal quotation marks omitted) (emphasis added).

<u>Kensington Int'l Ltd. v. Itoua</u>, 505 F.3d 147, 157 (2d Cir. 2007) (emphasis added in <u>Kensington</u>);

<u>Fagan</u>, 2011 WL 1197677, at *7 ("The second clause generally applies 'to non-commercial acts

in the United States that relate to commercial acts abroad.'" (quoting <u>Rogers</u>, 741 F.Supp.2d at

501) (quoting <u>Kensington Int'l, Ltd.</u>, 505 F.3d at 157)).

       Plaintiffs have argued that the Bank's sale of U.S.-based assets constitutes

commercial activity in the United States; that this activity in is breach of the NPA; and that these

facts give this Court a basis to exercise subject matter jurisdiction.  Plaintiffs have not, however,

pointed to any "<u>non-commercial</u> act[] [by the Bank] in the United States that relate[s] to

commercial acts abroad."  <u>See</u> <u>Kensington Int'l Ltd.</u>, 505 F.3d at 157 (emphasis in original).

Because Plaintiffs have "not argued that any non-commercial acts performed by [the Bank] in the United States allegedly formed the basis [for the amended] complaint[,]. . . . this prong of the commercial activities exception is . . . inapplicable." Id.

      **E.**    **Clause 3: Act Outside the United States in Connection with Commercial Activity Outside the United States that Causes a Direct Effect in the United States**

           **1.**    **Applicable Law**

The third clause of 28 U.S.C. § 1605(a)(2) applies where a plaintiff's claim is "(1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [defendant] outside [the United States]; and (3) that 'cause[d] a direct effect in the United States.'" Weltover, 504 U.S. at 611 (last alteration in original) (quoting 28 U.S.C. § 1605(a)(2)); see also Rogers, 741 F. Supp. 2d at 502.

The Second Circuit has instructed that "[t]he statutory term 'in connection,' as used in the FSIA, is a term of art," and is to be "interpret[ed] . . . narrowly." Garb, 440 F.3d at 587. "'[A]cts are "in connection" with . . . commercial activity so long as there is a "substantive connection" or a "causal link" between them and the commercial activity.'" Id. (quoting Hanil Bank v. Pt. Bank Negara Indonesia (Persero), 148 F.3d 127, 131 (2d Cir. 1998)) (citing Drexel Burnham Lambert Group Inc. v. Comm. of Receivers for A.W. Galadari, 12 F.3d 317, 330 (2d Cir. 1993)); see also Anglo-Iberia, 600 F.3d at 178 ("As such, 'acts are "in connection" with . . . commercial activity so long as there is a "substantive connection" or a "causal link" between them and the commercial activity.'" (citing Garb, 440 F.3d at 587; Stena Rederi AB v. Comision de Contratos, 923 F.2d 380, 387 (5th Cir. 1991) (holding that the "in connection with" requirement of the "commercial activity" exception was not satisfied where "the few commercial acts on which [the plaintiff] relies for its argument that [the defendant] has no sovereign immunity are unrelated to the facts on which [the plaintiff] relies for its causes of action") (cited

in Garb, 440 F.3d at 587); Drexel Burnham Lambert Group Inc., 12 F.3d at 330 (declining to

read "the 'connection' language of § 1605(a)(2) . . . to include tangential commercial activities

to which the 'acts' forming the basis of the claim have only an attenuated connection").

        With respect to the "direct effect" requirement, the Second Circuit has stated that

> [t]o be a "direct" effect within the meaning of the third clause of the commercial
> activity exception, the impact need not be either substantial or foreseeable, see
> Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 617-18 (1992) ("Weltover
> II"), aff'g 941 F.2d 145 (2d Cir. 1991) ("Weltover I"); rather, "an effect is 'direct'
> if it follows 'as an immediate consequence of the defendant's . . . activity,'"
> Weltover II, 504 U.S. at 618 (quoting Weltover I, 941 F.2d at 152). In Weltover
> I, we indicated that, by "immediate," we meant that, between the foreign state's
> commercial activity and the effect, there was no "intervening element." 941 F.2d
> at 152; see also Martin v. Republic of South Africa, 836 F.2d 91, 95 (2d Cir.
> 1987) ("Martin") ("The common sense interpretation of a 'direct effect'" within
> the meaning of § 1605(a)(2) "is one which has no intervening element, but, rather,
> flows in a straight line without deviation or interruption." (other internal quotation
> marks omitted)). We have held that "the requisite immediacy" is lacking where
> the alleged effect "depend[s] crucially on variables independent of" the conduct
> of the foreign state. Virtual Countries, 300 F.3d at 238.

Guirlando, 602 F.3d at 74-75.

        The Second Circuit has also stated that the immediacy requirement

> implies no "unexpressed requirement of 'substantiality' or 'foreseeability,' "but
> rather "ensures that jurisdiction may not be predicated on purely trivial effects in
> the United States." [Weltover, 504 U.S. at 618.] "Congress did not intend to
> provide jurisdiction whenever the ripples caused by an overseas transaction
> manage eventually to reach the shores of the United States." United World Trade,
> Inc. v. Mangyshlakneft Oil Prod. Ass'n, 33 F.3d 1232, 1238 (10th Cir. 1994),
> cert. denied, 513 U.S. 1112 (1995); accord Voest-Alpine Trading USA Corp. v.
> Bank of China, 142 F.3d 887, 894-95 n. 10 (5th Cir. 1998) ("[T]he third clause
> does not permit jurisdiction over foreign states whose acts cause only speculative,
> generalized, immeasurable, and ultimately unverifiable effects in the United
> States."), cert. denied, 525 U.S. 1041 (1998).

Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 237 (2d Cir. 2002) (alterations in

original).

"In determining where the effect is felt directly," the Second Circuit

"look[s] to the place where legally significant acts giving rise to the claim occurred."

Guirlando, 602 F.3d at 75 (citing Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511,

1515 (D.C. Cir. 1988) (legally significant event must occur in the United States).  "'An

injury to a corporation occurs in some legally significant situs, for instance, . . . a place

designated for performance of a contract.'"  Id.  (quoting Weltover, 941 F.2d at 152)

("The legally significant act was defendants' failure to abide by the contractual terms;

i.e., to make payments in New York.  The effects occurred, in the first instance, in New

York, when the plaintiffs' accounts were not credited with the outstanding amount of

U.S. dollars.  As such, the act of nonpayment caused a direct effect in the United

States.").

Where a foreign entity breaches its obligation to make payment in the

United States, the breach is a "legally significant act" occurring in the United States and

the "direct effect" is felt here:

> In cases involving the legally significant act of failing to honor or repay
> financial instruments . . . "nonpayment of a commercial obligation by a
> foreign state or its instrumentality has a direct effect in the United States if
> the defaulting party was contractually obligated to pay here."  Dar El–Bina
> Eng'g & Contracting Co. v. Republic of Iraq, 79 F. Supp. 2d 374, 382
> (S.D.N.Y. 2000).  The Second Circuit has found a direct effect where the
> defaulting party agreed to make payments in one of several enumerated
> cities, including New York, Weltover I, 941 F.2d 145, and where the
> defaulting party agreed in advance to make payments per payee's
> instructions and payee chose a New York bank.  Hanil Bank v. PT. Bank
> Negara Indonesia, 148 F.3d 127 (2d Cir. 1998).

Rogers, 741 F.Supp. 2d, at 503.[14]

---

[14]  See also Fagan, 2011 WL 1197677, at *7 (quoting Guirlando, 602 F.3d at 76-79) ("The
location of that direct effect – within the United States or without – is determined by reference to
the location of the effect of 'legally significant acts;' 'the mere fact that a foreign state's

2.     **Analysis**

In connection with the third clause of the commercial activity exception, Plaintiffs assert that their claims are (1) "based upon" acts outside the United States, including the Bank's merger with INBS and sale of assets; (2) that "the Bank's [merger with INBS and] ongoing foreign asset sales are commercial activity conducted 'elsewhere'"; and (3) that these acts "'cause[d] a direct effect in the United States'" because of "the increased risk that Noteholders will not receive payments in New York."  (Pltf. Second Supp. Br. 17-19)  Plaintiffs' argument founders on the "direct effect" requirement.

While courts have found that the failure to remit funds payable in the United States meets the "direct effect" requirement, see e.g., Weltover, 504 U.S. at 607-608 (holding that Argentina's unilateral rescheduling of repayment had a "direct effect" in the United States because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming"); Dar El–Bina Eng'g & Contracting Co. v. Republic of Iraq, 79 F. Supp. 2d 374, 382 (S.D.N.Y. 2000) ("nonpayment of a commercial obligation by a foreign state or its instrumentality has a direct effect in the United States if the defaulting party was contractually obligated to pay here"); Virtual Countries, 300 F.3d at 239 ("[A]n anticipatory contractual breach occurs 'in the United States' for the jurisdictional purposes of § 1605(a)(2) if performance could have been required in the United States and then was requested there."); Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 241 (2d Cir. 1994) (the "failure of the [defendants] to remit funds in New York, as they were contractually bound to do, had a direct effect in the United States"), there is no claim of non-payment here.

---

commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States.'").

Unable to allege an actual failure to pay in New York, Plaintiffs argue that the "direct effect" requirement is satisfied because of "the increased risk that Noteholders will not receive payments in New York." (Pltf. Second Supp. Br. 19)  Plaintiffs have provided no legal authority demonstrating that – under the facts of this case – the alleged increased risk of non-payment caused a "direct effect" in the United States within the meaning of the third clause of the commercial activity exception.  Moreover, Plaintiffs' argument runs counter to the Second Circuit's caution that "the third clause [of the commercial activity exception] does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States." Virtual Countries, Inc., 300 F.3d at 237 (quoting Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 894-95 n. 10 (5th Cir. 1998) (first alteration in original)).

Plaintiffs' reliance on U.S. Fidelity & Guaranty Co. v. Braspetro Oil Services. Co., No. 97 CIV. 6124(JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999), aff'd, 199 F.3d 94, 98-99 (2d Cir. 1999) (per curiam), see Pltf. Supp. Br. 19, is misplaced.  That case was brought by American sureties that had issued performance bonds in favor of defendant.  The bonds guaranteed the performance of certain Brazilian construction contractors.  In the event of a default, plaintiffs had agreed to make payment on the bonds in New York.  Braspetro, 1999 WL 307666, at *1-*2.  Defendant allegedly drastically altered the contractors' duties under the applicable contracts, substantially increasing the costs of performance and "heightening the risk of contractor default."  Id. at *3.  The plaintiff sureties alleged that the defendant had breached both the underlying contracts and the terms of the bonds by interfering with the contractors' performance and by "directing the premature and excessive payment of millions of dollars from [defendant's] New York bank accounts to the [contractors] for work that had not yet been

37

performed and without the plaintiffs' consent." Id. at *11.  After defendant served default

notices on the plaintiff sureties, they filed a declaratory judgment action. Id. at *1, *3, *11.

The district court concluded that the defendant and related entities were either a

"foreign state" under the FSIA or the alter ego of a foreign state, and went on to consider

whether the commercial activity exception deprived defendant of immunity.  (Id. at *9-*11)  The

district court ruled that the defendant was not entitled to immunity, because both clause 1 and

clause 3 of the commercial activity exception were applicable.

As to clause 1, the court noted that the defendant had negotiated and procured

performance bonds in New York and had caused "payment of millions of dollars from [its] New

York account [that] allegedly contributed to the purported defaults, which triggered the co-

sureties' duty to pay on those Bonds in New York."  (Id. at *12)  The court concluded that these

acts were sufficient under clause 1 to demonstrate that "the plaintiffs' action is based on a

'commercial activity carried on in the United States' by [defendant]."  (Id.)

As to clause 3, the district court noted that defendant did not dispute that its

construction project constituted a "'commercial activity outside the United States'" and that "the

changes it allegedly ordered to the project work plans [were] 'acts outside the United States.'"

(Id. at *13)  Defendant argued, however, "that these acts did not cause a 'direct effect' in the

United States."  (Id.)

In considering the applicability of clause 3, the district court ruled that plaintiffs

were required to demonstrate both that defendant's actions caused a "'direct effect in the United

States'" and that "legally significant acts . . . occurred in the United States."  (Id. at *13)  In

finding a "direct effect" in the United States, the district court noted that defendant's declaration

of defaults

> triggered the plaintiffs' duty under the Bonds. . . . One of those duties is the payment of substantial damages in United States dollars – up to a potential total of over U.S. $270 million – from their bank accounts in the United States. . . . The payment of such a large sum of money from United States accounts causes a "direct effect in the United States."

(Id.)  The district court also noted that plaintiffs alleged that the performance bonds

> were negotiated directly and indirectly by [defendant's] agents in New York . . . and that [defendant] made premature and excessive payments not covered by the . . . [bonds] from [its] New York bank account. . . . To the extent that these substantial financial transactions in the United States materially altered the risks to the plaintiffs under the Bonds, they are legally significant acts. . . .

(Id. at 14)  In sum, the district court determined that the excessive payments in New York which increased the risk to Plaintiffs were "legally significant acts," but found that it was the potential payment of $270 million from United States bank accounts that constituted the "direct effect" in the United States.

In affirming per curiam, the Second Circuit noted that the plaintiff American sureties

> alleged, and the district court found, that [defendant] made the decision to declare its co-defendants in default.  Braspetro, 1999 WL 307666, at *10.  The district court also found that the plaintiffs received notice of the default from [defendant].  Id. at *3.  These acts by or attributable to [defendant] were taken "in connection with" [its] commercial construction projects.  The acts triggered plaintiffs' obligations under the . . . performance bonds and thus had the "direct effect" in the United States of giving rise to plaintiffs' claims for indemnification.  The indemnity agreements require payment in the United States, are governed by New York law, and invoke the jurisdiction of the United States District Court for the Southern District of New York.

Braspetro, 199 F.3d at 98-99.

Nothing in Braspetro suggests that Plaintiffs have demonstrated either a "legally significant act" in the United States or a "direct effect" in the United States flowing from the Bank's alleged overseas merger and sale of assets.  Unlike in Braspetro, the Bank's alleged

overseas commercial activities have not triggered any obligation or duty on anyone's part to do anything in the United States. Moreover, while a breach of contract committed in the United States may constitute a "legally significant act," for the reasons discussed above, the Bank's anticipated sale of U.S.-based assets does not constitute a breach of the NPA and the Bank is not in breach of any of its obligations to make payment in New York. Finally, to the extent that the Bank's post-nationalization acts have increased the risk of non-payment, the effects of that increased risk have been felt in the Cayman Islands – where Plaintiffs are based – and not – as in Braspetro – in New York.

In sum, there has been no non-payment here that could support a finding of a "direct effect" in the United States, and Plaintiffs have not identified any other effect flowing from the Bank's overseas commercial activities that meets the requirements of clause 3. Accordingly, the third clause of the commercial activity exception does not provide a basis for this Court's exercise of subject matter jurisdiction.

## CONCLUSION

For the reasons stated above, Defendant is a "foreign state" within the meaning of the FSIA. Plaintiffs have not demonstrated that Ireland has waived sovereign immunity for purposes of this action or that any exception to sovereign immunity is applicable. Accordingly, this action is dismissed for lack of subject matter jurisdiction and Plaintiffs' motion for a preliminary injunction is denied as moot. The Clerk of the Court is directed to terminate the motion and to close this case.

Dated: New York, New York
       November 28, 2011                    SO ORDERED.

                                            Paul R. Gardephe

                                            Paul G. Gardephe
                                            United States District Judge

40